UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| rue21, inc., | **FIRST AMENDED COMPLAINT** |
| *Plaintiff,* | |
| v. | Case No. 1:14-cv-7018 |
| VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, and MASTERCARD INTERNATIONAL INCORPORATED, | |
| | Electronically filed |
| *Defendants.* | |
| | **JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff rue21, inc. ("rue21") by its undersigned attorneys **Meyer, Darragh, Buckler, Bebenek & Eck, PLLC**, alleges, upon knowledge with respect to their own acts and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.    rue21 is a specialty apparel retailer offering men's and women's casual apparel and accessories.  In the United States, rue21 operates approximately 1,100 retail outlets and employs in excess of 14,800 people.

2.    rue21 brings this action against Visa[1] and MasterCard (collectively "Defendants") for violations of federal and state antitrust laws resulting from Visa's and MasterCard's

---

[1] Capitalized terms used herein are specifically defined in this Amended Complaint in Section III, "Definitions."

imposition upon rue21 of millions of dollars in unlawful and excessive Interchange Fees associated with Credit and Debit Card (collectively "Payment Card") transactions beginning on January 1, 2004 and continuing through the date of judgment ("Damages Period").[2] Additionally, rue21 seeks injunctive relief for past and ongoing anticompetitive conduct by the Defendants.

3.      When the Damages Period began in 2004, Visa and MasterCard were the enterprises and/or instrumentalities that effectuated the conspiracies among each association's owner/Member Banks that had agreed to unreasonably, and illegally, restrain competition.  Prior to Visa's corporate restructuring in 2006 ("the Visa IPO") and MasterCard's in 2008 ("the MasterCard IPO"), Visa and MasterCard were each organized as a membership corporation, the owners and members of which were virtually all of the competing banks and financial institutions that issue Payment Cards to consumers and/or that signed merchants to accept such cards.  Each membership was governed by executives selected from Visa's and MasterCard's Member Banks.  As the Second Circuit held, Visa and MasterCard were "not single entities; they [were] consortiums of competitors."  *See United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242

---

[2] The conduct complained of herein is ongoing.  The original Complaint defined the "Damages Period" as January 1, 2004 through November 27, 2012.  rue21 and all other opt-out plaintiffs were barred from seeking monetary and equitable relief past November 27, 2012, despite the continuing harm caused by the restraints of trade discussed throughout this Amended Complaint, by the preliminary class settlement and related injunction in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720(JG)(JO) (E.D.N.Y.) ("MDL 1720").  On June 30, 2016, the United States Court of Appeals for the Second Circuit issued an Opinion vacating the District Court's certification of the Class. As rue21 and numerous other merchants argued in formally objecting to the now defunct settlement, and the Second Circuit agreed, the previous injunction violated rue21's and the other merchants' due process rights by improperly barring their individualized claims for ongoing and future damages by not providing the right to completely opt out of the settlement and assert such claims. rue21 expressly reserved the right in its original Complaint to amend its claims for additional monetary, equitable, and/or injunctive relief in the event the preliminary class settlement and related injunction was lifted or rue21 was otherwise permitted by law to do so.  Accordingly, in view of the Second Circuit's Opinion, rue21 is amending its Complaint, seeking damages for the continuing harm inflicted by the Defendants imposition of supracompetitive Interchange Fees and other anticompetitive conduct.

(2d Cir. 2003).

4.      Visa and MasterCard were and are the enterprises and/or instrumentalities through which the Member Banks that issued Visa and MasterCard Payment Cards have agreed not to compete with respect to merchant acceptance of those cards and fixed the Interchange Fees that merchants pay for acceptance of those cards.   These conspiracies began when Visa and MasterCard were structured as consortiums of competitors and continued unabated after the corporate reorganizations.   In fact, Visa and MasterCard and their Member Banks designed the restructurings to limit the appearance that Visa and MasterCard were controlled by their Member Banks and to mask the perpetuation of their anticompetitive cartels.   For example, according to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard.   In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."   The banks sitting on Visa's and MasterCard's boards ratified these transactions on the anticompetitive conditions that all Member Banks continue to adhere to their agreements not to compete and that Visa and MasterCard maintain the default Interchange Fee rules that support the price fixing conspiracies. Based on this continuation of the underlying conspiracies, nothing has changed since the IPOs and, if anything, Visa's and MasterCard's substantial market power has increased.

5.      As detailed herein, both Visa and MasterCard, along with their co-conspirator Member Banks, engaged and continue to engage in conspiracies in restraint of trade in the Credit Card and Debit Card markets in the United States primarily by: (a) agreeing to collusively fix at

supracompetitive levels the prices that merchants pay to accept their respective Payment Cards (the "Default Interchange Fee"); (b) implementing a scheme not to compete for merchant acceptance of their respective Payment Cards (the "Honor All Issuers" rule); and (c) adopting nearly identical rules such as the Honor All Cards Rules, No Discount Rules, No Surcharge Rules, Anti-Discrimination Rules, All Outlets Rules and other restraints.

6.      These schemes and agreements to fix prices and not to compete have ensured that Visa and MasterCard, and their co-conspirator Member Banks, enjoyed, and continue to enjoy, supracompetitive profits.  The Member Banks have consistently declined to individually negotiate Payment Card acceptance with merchants even though it could or would have provided them with a competitive advantage to do so.  These supracompetitive profits also lure additional banks into joining the conspiracies, maintaining and enhancing the cartels' substantial market power.  Thus, their illegal competitive restraints serve both to bind Visa's and MasterCard's twin cartels with their owner and Member Banks, and to expand those cartels to achieve substantial market power in the Payment Card markets throughout the Damages Period.

7.      Visa's and MasterCard's  agreements with and among their Member Banks not to compete, and their price fixing schemes, are naked restraints of trade and *per se* violations of Section 1 of the Sherman Act.

8.      However, even if the Defendants' conduct is analyzed under the rule of reason, their conduct and the resulting massive anticompetitive harm constitute unreasonable restraints of trade in violation Section 1 of the Sherman Act.

9.      The Defendants' anticompetitive rules and practices are not reasonably necessary for the functioning of Payment Card Networks.  Interchange Fees are not necessary given the

economics of issuing Payment Cards and any benefits that Defendants may claim are derived from these restraints of trade can be achieved by means that are less destructive and harmful to competition. Further, these restraints' anticompetitive effects, including massive overcharges to merchants and maintenance of substantial market power, outweigh any alleged benefit.

10.    The anticompetitive harm to merchants and consumers from the Defendants' price fixing and other anticompetitive conduct has been enormous. During the Damages Period, Defendants have imposed Interchange Fees estimated at more than $450 billion on merchants in the United States, including more than $19 million on rue21. Defendants' anticompetitive conduct also has limited competition in the Payment Card markets, depriving participants in these markets of lower prices, innovation, new payment options, and cost-saving approaches that would have substantially benefited U.S. merchants and consumers.

## II. JURISDICTION AND VENUE

11.    This Amended Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 (federal question), 1337 (commerce and antitrust regulation), 2201, and 2202 (injunctive relief). The Court has jurisdiction over state antitrust and unfair competition law claims alleged herein under 28 U.S.C. § 1367.

12.    Defendants transact business throughout the United States, including in this District, have substantial contacts with the United States, including this District, and/or are engaged in an illegal and anticompetitive scheme that is directed at and has the intended effect of

causing injury to persons residing in, located in, and/or doing business throughout the United States, including in this District.  The interstate trade and commerce involved and affected by the alleged violations of antitrust law occurred and continues to occur, in part, in this District.  The acts complained of have had, and will have, substantial anticompetitive effects in the District.  Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

## III. DEFINITIONS

13.     The following terms are used in this Amended Complaint:

**Relevant Parties and Entities**

a.     "<u>rue21</u>" and "<u>Plaintiff</u>" mean rue21, inc. as it exists now and has existed throughout the Damages Period.

b.     "<u>Visa</u>" means Visa U.S.A., Visa International, and Visa Inc. collectively.

c.     "<u>Visa IPO</u>" means the corporate restructurings of Visa generally described in Sections I. and IV.B.1. of this Amended Complaint.

d.     "<u>MasterCard</u>" means MasterCard Incorporated and MasterCard International Incorporated (and MasterCard Worldwide) collectively.

e.     "<u>MasterCard IPO</u>" means the corporate restructurings of MasterCard generally described in Sections I. and IV.B.2. of this Amended Complaint.

f.     "<u>Defendants</u>" means Visa and MasterCard collectively.

**Payment Cards**

g.     "<u>Payment Card</u>" means a Credit Card or a Debit Card.

*Credit Cards*

h.     "<u>Credit Card</u>" means a plastic or similar payment card or other physical form, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Credit Cards include Premium Credit Cards and Charge Cards, but not private label or proprietary credit cards that can typically be used at only a single merchant.

i.      "Premium Credit Card" means a Credit Card that carries a higher Interchange Fee than standard Credit Cards and is required by a Network to provide a certain level of rewards or incentives to the cardholder.  The "Visa Signature Preferred Card" product and "World MasterCard Card" product are examples of Premium Credit Cards.

j.      "Charge Card" (also referred to as a "Travel and Entertainment Card" or "T&E card") is a Payment Card for which the cardholder is required, under most circumstances, to pay the card balance in full each month.  Diners Club cards and traditional American Express Green, Gold, Platinum and Centurion (Black) cards without preset spending limits are examples of Charge Cards.

k.      "Payment Card Network" and "Network" means an electronic payment system used to accept, transmit or process transactions made by Payment Cards for money, goods or services and to transfer information and funds among Issuers, Acquirers, merchants and users of Payment Cards.  Both Visa and MasterCard operate Payment Card Networks.

l.      "Credit Card Network Services" means the services and infrastructure that a Network and its members provide to merchants through which payment transactions using Credit Cards are conducted, including authorization, clearance, and settlement.

### Debit Cards

m.      "Debit Card" means a plastic or similar payment card or other physical form, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account at a bank or other financial institution.  Visa's Signature Debit Card program (the "Visa Check Card") and MasterCard's Signature Debit Card program (sometimes referred to as "Debit MasterCard") are Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and MasterCard's Maestro networks.  Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's demand deposit account.  Examples include, but are not limited to, payroll cards, cards associated with a flexible spending account, health reimbursement arrangement, or health savings account.

n.      "PIN Debit Card" means a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point-of-sale and entering a personal identification number ("PIN").  PIN Debit Card networks grew out of regional ATM networks and are processed differently than Signature Debit Card transactions.  Examples of PIN Debit Card networks include Visa's Interlink network, MasterCard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

o.      "Signature Debit Card" means a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as Credit Card transactions.  Examples of

Signature Debit Cards include the Visa Check Card product and the Debit MasterCard product.

p. "<u>Debit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using Debit Cards are conducted, including authorization, clearance, and settlement.

## The Credit and Debit Card Transaction

q. "<u>Issuer</u>" means a bank or other financial institution that issues Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations. Issuers authorized by the Visa and MasterCard Payment Card Networks to issue Visa- and/or MasterCard-branded Payment Cards are members of those Networks.

r. "<u>Acquirer</u>" means a bank or other financial institution that has been authorized by a Payment Card Network to enter into agreements with merchants that enable those merchants to accept Payment Cards for the purchase of goods and services. Acquirers authorized by the Visa and MasterCard Payment Card Networks to acquire Visa- and/or MasterCard-branded card transactions are members and/or agents of those Networks.

s. "<u>Member Bank</u>" or "<u>Member Banks</u>" refer to those banks, financial institutions and entities that are members of either or both of the Visa and/or MasterCard Payment Card Networks. Several Member Banks are and have been throughout the Damages Period both Issuers and Acquirers. The Member Banks that are Issuers are actual or potential competitors for the issuance of Payment Cards. The Member Banks that are Acquirers are actual or potential competitors for acquisition of merchants. The great majority of Member Banks are members of both the Visa and MasterCard Payment Card Networks.

t. "<u>Processor</u>" means an entity that a merchant contracts with to handle credit card and/or debit card transactions on behalf of the acquiring bank. This includes both front-end and back-end processing.

u. "<u>Interchange Fees</u>" are fees or rates fixed by Visa or MasterCard and their Member Banks that are paid to Issuers by merchants in conjunction with transactions in which Visa or MasterCard Payment Cards are used as a means of payment for purchases of goods and services. Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa or MasterCard Payment Card transaction.

v. "<u>Honor All Issuers</u>" rules are the "Honor All Cards" rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded Credit Cards to accept all such Credit Cards that carry the brand of that network, and the rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded Debit Cards to accept all such Debit Cards that carry the brand of the respective Network.

# IV. PARTIES

### A.    Plaintiff

14.    rue21 is a corporation created and existing under the laws of Delaware, with its principal place of business in Warrendale, Pennsylvania.

15.    During the Damages Period, rue21 has accepted Visa and MasterCard Payment Cards both at its retail stores and for internet sales.

16.    rue21 timely opted out of MDL 1720.

### B.    Defendants

### 1.    Visa

17.    Prior to the Visa IPO, Defendant Visa International Service Association ("Visa International") operated as a nonstock Delaware corporation with its principal place of business in Foster City, California.  Its owners/members included approximately 21,000 Member Banks.

18.    Prior to the Visa IPO, Defendant Visa U.S.A. Inc. ("Visa U.S.A.") operated as a nonstock Delaware corporation with its principal place of business in Foster City, California.  Its owners/members included approximately 14,000 Member Banks.

19.    Prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors (and Visa International had regional boards of directors for each of its geographical regions) comprised of executives selected from their Member Banks.  Visa U.S.A. also was a regional group member of Visa International.

20.     Visa U.S.A. and Visa International, as well as other Visa entities not named as defendants in this Amended Complaint, conducted a number of restructurings in 2007 and 2008 to combine several previously independent corporate entities into Defendant Visa Inc.

21.     On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its Member Banks.

22.     As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in San Francisco, California.  Also, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa Inc. and continue to operate as such today.

23.     Visa operates Payment Card Networks and did so throughout the Damages Period.

**2.     MasterCard**

24.     Prior to the MasterCard IPO, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant MasterCard International Incorporated, a wholly owned subsidiary of MasterCard Incorporated with its principal place of business in Purchase, New York, was a Delaware membership corporation that, prior to the MasterCard IPO, consisted of more than 23,000 owners/Member Banks worldwide and was the principal operating subsidiary of MasterCard Incorporated.

25.     Prior to the MasterCard IPO, MasterCard Incorporated and MasterCard International Incorporated were governed by a global board of directors, as well as regional boards of directors for each of their geographic regions, that were comprised of executives selected from their Member Banks.

26.     On May 25, 2006, MasterCard Incorporated and MasterCard International Incorporated conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to MasterCard's Member Banks.

27.     As a result, MasterCard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, MasterCard International Incorporated has remained MasterCard Incorporated's principal operating subsidiary with its principal place of business in Purchase, New York, and doing business as MasterCard Worldwide.

28.     MasterCard operates Payment Card Networks and did so throughout the Damages Period.

## V. FACTUAL ALLEGATIONS

### A.    Relevant Product Markets

29.     Merchants' demand for Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a Payment Card) is derived from consumer demand for using Payment Cards to pay for goods and services.

Accordingly, because consumer demand establishes both a distinct Credit Card market as well as a Debit Card market, there are corresponding markets, based upon derived merchant demand, for Credit Card Network Services and Debit Card Network Services.

30.     Credit and Debit Cards are not reasonably interchangeable with each other or with other forms of tender.

**1.      There Are Distinct Markets for Credit Card Network Services and Debit Card Network Services.**

     **a.      Credit Card Network Services**

31.     There have been relevant product markets for Credit Cards and Credit Card Network Services throughout the Damages Period.  The existence of these markets is confirmed by economic analysis of cross-elasticity of demand, by industry, by public recognition, and by recent judicial decisions in cases related to the claims asserted in this Amended Complaint. These markets continue to be relevant product markets today.

32.     Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer.  These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time. Charge Cards are a subset of Credit Cards that require the consumer to pay off the balance owed upon receipt of their statement, usually monthly.

33.     From the consumer perspective, there are no close substitutes for Credit Cards because other forms of payment do not offer comparable credit facilities.  Thus, for large purchases that a consumer needs to finance over time, Credit Cards are better than other payment methods such as cash, checks, and Debit Cards, which do not allow deferred payment.  This

feature is reflected in studies of consumer payment patterns, which show that the average transaction size for Credit Card transactions consistently has significantly exceeded the average ticket for Debit Card transactions since the mid-1990s.

34.     In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 336 (S.D.N.Y. 2001), *aff'd*, 433 F. 3d 229 (2d Cir. 2003), the court held that "consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards."  The court also found that Issuers "do not view cash or checks as 'competitive' with general purpose [credit] cards."  *Id.*  Most consumers do not want to carry large sums of cash to make large purchases, and checks do not match the acceptance of Credit Cards.

35.     Thus, Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions and for which other payment methods are not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for Credit Cards.  This has been the case throughout the Damages Period.

36.     As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such [hypothetical] price increase unprofitable for a hypothetical monopolist of general purpose [credit] card products."

37.     Limited purpose proprietary credit cards, such as the Sears' card, generally were (and are) accepted only by a single merchant.  Consumers, as a result, did not (and do not) consider proprietary credit cards to be reasonably interchangeable with Credit Cards that can be used at numerous merchant locations, as recognized by the court in *United States v. Visa U.S.A.*

*Inc.*  That court held that "[b]ecause proprietary cards, such as a Sears or Macy's card, are accepted only at a single merchant[,] consumers do not believe that proprietary cards are substitutes for general purpose [Credit and Charge Cards] and therefore they should not be included in the relevant market."  163 F. Supp. 2d. at 336.  Because of their limited utility, proprietary cards did not (and do not) constrain the prices to merchants for accepting Credit Cards.

38.    The events following the settlement of the *Visa Check* class action (*In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.)) challenging the credit/debit tying rules, discussed further in sections V.E. and V.F. below, also support the conclusion that Credit Cards and Debit Cards are in separate markets.  The settlements required Visa and MasterCard to untie Credit Card and Debit Card acceptance and give merchants the right to choose to accept one product without the other.  Once the settlements went into effect on January 1, 2004 and the tie between credit and debit acceptance was broken, Visa and MasterCard increased Credit Card Interchange Fees and reduced Signature Debit Card Interchange Fees.  This outcome demonstrates that Credit Cards and Debit Cards are in separate markets.

39.    Interchange Fees for both PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated regulations pursuant to the Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"), but Credit Card Interchange Fees have not decreased in response to reduced Debit Card fees to merchants.  The absence of sensitivity of Credit Card Interchange Fees to Debit Card Interchange Fees is strong economic evidence that Credit Cards and Debit Cards are not in the same relevant market.

40.     Throughout the Damages Period, Visa and MasterCard have continued to raise Credit Card Interchange Fees, including significant rate increases for Premium Credit Card transactions, and no merchants have stopped accepting Visa and MasterCard Credit Card transactions.  This shows that merchants continue to believe that a sufficient number of consumers view Credit Cards as unique and that merchants must accept them.

41.     Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

### b.     Debit Card Network Services

42.     There have been relevant product markets for Debit Cards and Debit Card Network Services throughout the Damages Period.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry, by public recognition, and by recent judicial decisions in cases related to the claims asserted in this Amended Complaint. These markets continue to be relevant product markets today.

43.     Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a demand deposit or checking account.  Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.  Depending on the type of debit transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days.

44.     Both PIN and Signature Debit Cards offer basically the same functionality to consumers in providing a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this.

45.     Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's demand deposit account, Debit Cards are strongly differentiated from Credit Cards.  Consumers do not consider Credit Cards to be an adequate substitute for Debit Cards.  Consumers tend to use Debit Cards for everyday purchases, such as groceries, small household items, and other small value purchases, especially of non-durable goods.  Many consumers segment their purchases and prefer to put these everyday purchases on their Debit Cards and use their Credit Cards for larger ticket items that are not consumed on a monthly basis.

46.     In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 337, the court held that:

> Consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards.   Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a PIN number, are not adequate [substitutes for general purpose credit cards].  Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. . . .   Knowledgeable industry executives agree with these conclusions.

47.     Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases).  As Visa and MasterCard have acknowledged, Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option.  Consumers view Debit Cards as superior to cash and checks.  Thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase.  Cash and checks also are not reasonably interchangeable with Debit Card Network Services for merchants.  As the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero ("at par") to supracompetitive levels, merchants did not substitute away from debit.

48.     Merchant demand exists separately for Credit Card Network Services and Debit Card Network Services.  As noted by the court in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003), "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct from merchant demand for debit card network services."  "[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole."  *Visa Check*, 2003 WL 1712568, at *7.

49.     Debit Cards are regulated separately and differently from Credit Cards as the maximum level of Interchange Fees set by the Durbin Amendment does not apply to Credit Cards.

**B.     The Geographic Market for All Relevant Product Markets is the United States.**

50.     Throughout the Damages Period and continuing to today, the geographic market for all relevant product markets has been the United States, including its territories.  Many of Visa's and MasterCard's rules regarding Credit Card and Debit Card transactions applied only to the U.S. market.  Visa and MasterCard also set policies and pricing, including Interchange Fees, separately for the United States.  Additionally, U.S. consumers would not find Credit Cards or Debit Cards issued in other countries, and therefore other currencies, to be adequate substitutes for Credit Cards or Debit Cards issued by U.S. banks.  Defendants also have demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants to turn to other services sufficiently to make these price increases unprofitable.

**C.     The Co-Conspirator Member Banks and Their Relationships with Visa and MasterCard**

51.     Certain Member Banks were board members of Visa from the beginning of the Damages Period through Visa's IPO in 2008 (and some were board members after as well.)  As Visa board members and/or as Visa owners, such Member Banks collectively controlled every aspect of Visa's business.  This collective control included their agreements:  (1) not to compete with one another for merchants' acceptance of Visa Payment Cards; (2) to fix the Interchange Fees for Visa Payment Card transactions in furtherance of their agreement not to compete; and (3) to set Visa's rules, including all such rules discussed in this Amended Complaint.

52.     Additionally, with control over pre-IPO Visa, the Member Banks explicitly agreed to proceed with Visa's IPO on the condition that Visa's post-IPO structure would enable substantive continuation of the agreement not to complete and attendant price fixing detailed in

this Amended Complaint.

53.     All Visa Member Banks effectively delegated to Visa, in perpetuity, the ability to fix the banks' Interchange Fees to merchants and knew that their fellow Visa Member Banks were also delegating their pricing decisions to Visa, which arrangement was further ratified by an agreement of Visa's Member Banks when they voted to approve Visa's restructuring.  Each Visa Member Bank knew that Visa would continue to enforce its default Interchange Fee and Honor All Issuers rules.

54.     Certain Member Banks were board members of MasterCard from the beginning of the Damages Period through MasterCard's IPO in 2006 (and some were board members after as well.)  As MasterCard board members and/or as MasterCard owners and Member Banks, such Member Banks collectively controlled every aspect of MasterCard's business.  This collective control included their agreement:  (1) not to compete with one another for merchants' acceptance of MasterCard Payment Cards; (2) to fix the Interchange Fees for MasterCard Payment Card transactions in furtherance of their agreement not to compete; and (3) to set MasterCard's rules, including all such rules discussed in this Amended Complaint.

55.     Additionally, with control over MasterCard before the IPO, the Member Banks explicitly agreed to proceed with MasterCard's IPO on the condition that MasterCard's post-IPO structure would enable substantive continuation of the agreement not to complete and price fixing detailed in this Amended Complaint.

56.     All MasterCard Member Banks effectively delegated to MasterCard, in perpetuity, the ability to fix the banks' Interchange Fees to merchants and knew that their fellow MasterCard Member Banks were also delegating their pricing decisions to MasterCard, which

arrangement was further ratified by an agreement of MasterCard's Member Banks when they voted to approve MasterCard's restructuring.  Each MasterCard Member Bank knew that MasterCard would continue to enforce its default Interchange Fee and Honor All Issuers rules.

57.    The Member Banks have conspired and continue to conspire with each other and with Visa and MasterCard not to compete with one another for merchants' acceptance of Payment Cards, to require the payment of an Interchange Fee on every Visa and MasterCard transaction, to fix the level of Interchange Fees that they charge to merchants, and engage in other anticompetitive conduct detailed in this Amended Complaint.

58.    After the IPOs, neither Visa nor MasterCard, nor any of the Member Banks, took any affirmative action to withdraw from the respective combinations.

59.    Indeed, after the IPOs, as before, Visa and MasterCard have served as managers, facilitators and coordinators of horizontal agreements among their Member Banks and have been the enterprises and instrumentalities by which Member Banks conspired for the anticompetitive purposes set forth in this Amended Complaint, which have eliminated and continue to eliminate competition for merchant acceptance among Issuers.

60.    It would be contrary to the independent self-interest of any Issuer to adhere to the anti-competitive restraints detailed herein without the agreement of the remaining Issuers also to impose and adhere to those restraints and, but for the arrangements facilitated by Visa and MasterCard, the Issuers would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

61.     In other aspects of their businesses, the Member Banks compete against one another.  For example, Member Banks that are Issuers compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their payment cards more attractive than those offered by other issuing banks.  As found in *United States v. Visa U.S.A., Inc.*, cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protection programs."  163 F. Supp. 2d at 334.  These facts continue to be true today.  Certain Member Banks also compete to serve as Acquirers in merchant transactions.

62.     However, the Member Banks do not compete for merchant acceptance of the cards they issue.  Instead, both before and after the Visa and MasterCard IPOs, the Member Banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue.

63.     As discussed further below, by continuing to agree to and adhere to the anticompetitive restraints detailed in this Amended Complaint, Visa, MasterCard and the Member Banks have deprived the marketplace of independent centers of decision-making and, therefore, of actual and/or potential competition.  Based on this continuation of the underlying conspiracy, nothing has changed since the IPOs and, if anything, Visa's and MasterCard's substantial market power has grown.

### D.    Defendants' Anticompetitive Cartels

64.    Defendants, with their Member Banks, created and have maintained two separate cartels to implement their agreements to fix prices and not to compete.  One conspiracy was and is perpetrated by Visa and its Member Banks, and another was and is perpetrated by MasterCard and its Member Banks.

65.    The foundations of each of these conspiracies are Visa's and MasterCard's Honor All Issuers rules.  Pursuant to these rules, each Network's Member Banks have agreed that any merchant that accepts any one bank's Credit or Debit Cards issued over that Payment Card Network must accept all other banks' Credit or Debit Cards that carry the brand of that Network. These "all or nothing" rules constitute agreements among the Member Banks not to compete for merchants' acceptance of their Credit Cards and Debit Cards.

66.    To reinforce their agreements not to compete for merchant acceptance, each Network's Issuers have colluded to fix the Interchange Fees they charge merchants on every transaction through default Interchange Fee rules (discussed in greater detail below.)  This has prevented merchants from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market.

67.    Instead, merchants, including rue21, accepting either Visa or MasterCard Payment Cards pay the same Interchange Fee on a given transaction regardless of which Issuer is involved.  There is no competition.

68.    Within each conspiracy, the Issuers charge merchants exactly the same inflated Interchange Fee prices that are the products of the Member Banks' collusion.  These Member Banks typically compete vigorously for cardholders, but they do not compete for merchant

acceptance or for the Interchange Fees that rue21 and other merchants pay to accept their Visa and MasterCard cards.

69.     Visa and MasterCard are the enterprises by which otherwise competing Member Banks implement and effectuate their agreements not to compete and to fix prices.  These schemes have relied on rules, such as the Honor All Issuers rules, default Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes (discussed further below), which have bound Visa and MasterCard Issuers and Acquirers.

70.     In addition to inflicting direct anticompetitive harm on merchants with these price fixing conspiracies, Defendants also used them to acquire and maintain their substantial market power.  Specifically, Visa and MasterCard used these supracompetitive Interchange Fees as an incentive for Issuers (who ultimately receive the Interchange Fees paid by merchants) to issue Visa and MasterCard Payment Cards.  Using price fixing to induce Issuers to join their cartels, Visa and MasterCard acquired sufficient market power in the Payment Card markets such that most merchants are compelled to accept their cards for payment.  Moreover, once a merchant, such as rue21, starts accepting Visa's and MasterCard's Payment Cards for payment, it is impossible to stop accepting them.

71.     Once Visa and MasterCard acquired substantial market power over merchants, they have maintained it by forcing merchants to pay ever higher Interchange Fees to continue to fund these price fixing schemes and thereby perpetually maintain and enhance their cartels' market power.

72.     Although Visa and MasterCard initially focused their anticompetitive conduct on Credit Cards, once they achieved substantial market power in the Credit Card market they leveraged it to gain substantial market power in the Debit Card market by forcing merchants to accept Signature Debit Card transactions as a condition of accepting their dominant Credit Card transactions and by engaging in a variety of other exclusionary conduct.

73.     As the natural and intended consequences of their anticompetitive conduct, Defendants and the Member Banks set both Credit Card and Debit Card Interchange Fees at supracompetitive levels.  Such anticompetitive conduct has generated more than $450 billion in Interchange Fees for the colluding Issuers during the Damages Period.  Merchants, including rue21, have continuously paid these anticompetitive fees throughout the Damages Period and continuing to the present day.

74.     Defendants' anticompetitive conduct is not reasonably necessary to operate the Payment Card Networks.  As discussed below, domestic and international examples have demonstrated that Interchange Fees are economically unnecessary to encourage Issuers to issue Payment Cards or for these payment systems to function; thus, Defendants' and the Member Banks' collusively fixed and supracompetitive Interchange Fees were and are unjustifiable.

1.      **During the Damages Period, Visa and MasterCard Have Facilitated Horizontal Conspiracies of Their Member Banks.**

75.     As owners of Visa and MasterCard, and as board members and participants in key operating committees of Visa and MasterCard prior to Visa's and MasterCard's respective IPOs, the Visa and MasterCard Member Banks conspired to control every aspect of Visa's and MasterCard's business.  Such collective control was used to implement the Member Banks'

agreements not to compete for merchant acceptance of Payment Cards, and the associated agreements to fix Interchange Fees for Visa and MasterCard Payment Card transactions.  During the Damages Period, the Visa and MasterCard Member Banks ratified the default Interchange Fee schedules recommended by staff and consultants of Visa and MasterCard.  Also during that time, the conspiracies grew as more banks joined Visa and MasterCard and agreed to abide by the agreements to fix prices and not to compete, and as banks added new high Interchange Fee products to the universe of Visa and MasterCard products, such as Premium Credit Cards.

76.     In a decision affirming the condemnation of other exclusionary Visa and MasterCard rules, the Second Circuit held in 2003 that Visa and MasterCard:

> are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision. . . . <u>The restrictive provision is a horizontal restraint adopted by 20,000 competitors</u>.

*United States v. Visa U.S.A. Inc.*, 344 F.3d at 242 (emphasis added).  Like those restrictive provisions, to which certain Member Banks agreed in their capacities as board members and/or owners of Visa and MasterCard, the anticompetitive conduct by Visa and MasterCard establishing the agreements not to compete and price-fixing schemes were the products of conspiracies among competing Issuers that continue to this day.

### 2.     The Honor All Issuers Rules Constitute Unjustifiable Horizontal Agreements Not to Compete on Price.

77.     In order to eliminate any incentive for Issuers to compete for merchant acceptance based upon Interchange Fees, as they would have done  in a competitive market, the Member

Banks represented on Visa's and MasterCard's governing boards of directors approved the Honor All Issuers rules.  *See, e.g.,* MasterCard Rule 5.6.1, *MasterCard Rules* (Oct. 2008); Visa Rule 5.2B, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008). The rules require a merchant to accept all of a network's Issuers' Credit (or all Debit) Cards bearing the network's brand if that merchant wants to accept any single Issuer's Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.  These rules also prohibit merchants from steering consumers from using one Issuer's Visa or MasterCard Payment Cards to using Payment Cards issued by other Issuers or other cheaper forms of payment.

78.     Through these "all or nothing" rules, merchants like rue21 were and are forced to accept all Credit (or Debit) Cards bearing the Network's brand and simultaneously forbidden from steering consumers to less or the least expensive forms of payment, even to another Issuer or Payment Card within or bearing the Network's brand.  These rules force rue21 to accept a Visa Signature Preferred Card transaction, which bears an Interchange Fee ranging from 2.10% to 2.95% (plus $0.10), instead of attempting to steer the purchaser to a cheaper payment card, for which rue21 would pay a substantially lower, but still supracompetitive, Interchange Fee. Consequently, Issuers need not worry about losing business to a lower-cost competitor because all Payment Cards issued by every Issuer will be accepted at the default Interchange Fee rates. Because of these rules, Issuers have no incentive to enter into bilateral agreements outside of the conspiracy and price-fixing scheme, no incentive to offer any reduction to Interchange Fees, and no incentive to compete on price.  Thus, as a result of this conspiracy, the Default Interchange Fees have become a non-negotiable price floor because it makes no economic sense for any Issuer to compete on price.

79.     Without the Honor All Issuers rules, an individual, profit-maximizing Issuer's

economic interest would require it to lower the price it charges in order to compete for merchants' business against other Issuers of similar Payment Cards.  The Honor All Issuers rules eliminate market based incentives to engage in competition.  There is no competitive advantage for an issuer to compete on price or quality so long as merchants, including rue21, are forced to accept the Issuer's cards despite the supracompetitive fees.  In fact, because of these rules and this conspiracy, Acquirers and Issuers have rebuffed overtures from merchants to negotiate Interchange Fees and enter into mutually beneficial arrangements.

80.    Although Visa and MasterCard have argued that the Honor All Issuers rules are necessary to ensure universal acceptance of their Payment Cards and for their networks to function, their conduct demonstrates the pretextual nature of this position.  Visa and MasterCard have permitted and not been harmed by the introduction and use of products that function at only a subset of locations accepting Visa and MasterCard Payment Cards generally (such as selective-acceptance or selective-authorization cards, including, for example, flexible spending and health reimbursement account cards bearing network logos despite not having universal acceptance at Visa and MasterCard locations.)   After the original Damages Period (ending November 27, 2012), Visa and Chase Bank USA, N.A (and/or one or more if its affiliates, subsidiaries, predecessors or related companies)(collectively "Chase") entered into an arrangement that purports to provide merchants with the ability to prefer Chase-issued Visa Payment Cards over other Visa Payment Cards in certain circumstances.  Despite these facts, among others, the Payment Networks have continued to function.  Further, Visa's and MasterCard's objectives could be realized through less restrictive means.

81.    Documents produced in this litigation show how these rules have restrained Issuers from competing for cardholders by offering benefits at the point of sale.  At the start of

the Damages Period, in 2004, one Issuer 

82.     After the preliminary approval of the now-defunct settlement in MDL 1720, Visa and Chase entered into an agreement which gave Chase the ability to differentiate Chase-branded Visa Payment Cards from other Visa Payment Cards via bilateral agreements with certain merchants ("ChaseNet").     ChaseNet was designed to maintain the conspiracy while simultaneously accommodating Chase's desire to compete for cardholders by differentiating its products from other Issuers.     The arrangement preserved the horizontal conspiracy, by maintaining the Honor All Issuers and default Interchange Fee rules. 

Moreover, even if the Honor All Issuers rules have some legitimate rationale, those objections could be realized through less restrictive

means.

83.     Additionally, in early 2013 (during the time period when Visa was negotiating ChaseNet), Visa began allowing discounting by Issuer at the point of sale. *See, e.g.*, Visa Rule ID# 150413-010213-0027555 (Discounts, Offers, or In-Kind Incentives (New)), *Visa International Operating Regulations* (April 15, 2013), *Ch. 6, Payment Acceptance, Honoring Cards, Discount at the Point of Sale* ("Effective 1 February 2013, except where prohibited by applicable laws or regulations, a Merchant may provide Cardholders with a discount, promotional offer, or in-kind incentive at the point-of-sale that is not available for other Visa Cards."). This represented a material departure from Visa's previous rules, which permitted no effective differentiation by Issuer at the point of sale or point of interaction, by discounting or otherwise. MasterCard has consistently prohibited discounting by Issuer at the point of sale and continues to do so. *See, e.g.,* MasterCard Rule 5.11.1 (Discrimination), *Ch. 16, Additional U.S. Region and U.S. Territory Rules, MasterCard Rules* (July 7, 2016). Visa's conduct establishes that the various rules, including the Honor All Issuers rules, barring differentiation at the point of sale by Issuer cannot be justified. Those rules include the prohibition against surcharging by Issuer, which both Defendants still maintain.

84.     On an investor call in May 2013, during which ChaseNet was discussed, Visa Chief Executive Officer Charles Scharf admitted that Visa's rules barred Issuers from competing for merchant acceptance. Asked about Visa's arrangement with Chase, Mr. Scharf stated: "[t]he reality is I think if you go around and talk to most issuers, they would probably say that there wasn't a lot of conversation that went on between the issuing and acquiring side, <u>partially because of our rules that stood in the way of them working together to do something positive for the merchant</u>." Visa, Inc. Second Quarter 2013 Earnings Call Transcript, May 1, 2013 (emphasis

added).  The Defendants' rules continue to prevent banks and merchants, such as rue21, from "working together to do something positive" for merchants.

85.     Until the Defendants repeal all rules that bar Issuers from competing for cardholders through direct agreements with merchants (including the Honor All Issuers rules and the rules that bar Issuer differentiation at the point of sale) and repeal the default Interchange Fee rules, rue21 will continue to be harmed by supracompetitive Interchange Fees.

**3.     The Default Interchange Fee Rules are Unlawful Horizontal Agreements on Price.**

86.     The default Interchange Fee rules are the mechanisms that Defendants and their Member Banks use to fix Interchange Fee prices.  Both Visa and MasterCard require that a default Interchange Fee apply to every transaction for which the Issuer and Acquirer have not entered a separate, individually-negotiated agreement regarding fees ("bilateral agreement"). *See, e.g.,* MasterCard Rule 9.4, *MasterCard Rules* (Oct. 2008); Visa Rule 9.5, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008).  These rules underpinned the Interchange Fee schedules, which applied to Visa and MasterCard transactions throughout the Damages Period.

87.     While competition would motivate rival Issuers to charge lower fees than the default Interchange Fees, they have never done so because the Honor All Issuers rules, working in tandem with the default Interchange Fee rules, which eliminate any incentive for Issuers to charge fees below the anticompetitively-high levels being fixed by the above conspiracies.  As a result, there have been no bilateral agreements entered into by Member Banks of Visa or MasterCard.

88.     In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and MasterCard monitor transactions to ensure application of the appropriate Interchange Fee.   At the same time, Visa's and MasterCard's rules required all Issuers and Acquirers to adhere to all network rules.   *See, e.g.,* MasterCard Rule 1.5.5, *MasterCard Rules* (Oct. 2008); Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008).   Member Banks violating any of these network rules were and are subject to fines and even expulsion from Visa and MasterCard, and the networks cannot be held liable by such banks.   *See, e.g.,* MasterCard Rules 3.1, 3.1.2, 3.3, *MasterCard Rules* (Oct. 2008); Visa Rule 1.7, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008); Visa Core Principles 1, 2.3, *Visa Internal Operating Regulations* (Oct. 15, 2010).   This has enabled Visa and MasterCard to monitor compliance with and enforce the rules of their respective cartels.

89.     All Issuers use the same Default Interchange Fee schedules for any given Visa and MasterCard payment transaction but, within each of those schedules, there has been wide variability in the fees charged for various transactions.   For example, a schedule of Default Interchange Fees sets different fee levels for different card types (e.g., standard Credit Cards versus Premium Credit Cards).   This schedule of Default Interchange Fees imposes different fee levels by merchant category, with card-not-present merchants (for example, those that sell by Internet, phone, or mail order) paying substantially higher rates and with supermarkets and warehouse clubs paying comparatively low rates.   This price discrimination evidences Visa's and MasterCard's substantial market power.   While there are different fees within a given default Interchange Fee schedule, every Issuer applies the same fee schedule to a given transaction.   It is

this collusion by every Issuer to set identical default Interchange Fee schedules that constitutes price fixing.

**4.    rue21 Pays Interchange Fees Directly.**

90.    rue21 has directly paid supracompetitive, artificially inflated Interchange Fees to members of each of the illegal horizontal conspiracies alleged herein.

91.    When rue21 accepts a Visa or MasterCard Payment Card as payment for a transaction, rue21 is the direct purchaser of Payment Card Network Services and directly pays the Interchange Fees associated with that transaction.

92.    Upon information and belief, when a Payment Card transaction occurs, the Issuer directly deducts the Interchange Fee from the transaction amount due to rue21 before transmitting funds due on the transaction.

93.    Thus, rue21, not the Acquirer, directly pays the Interchange Fees.  Accordingly, rue21 accounts for Interchange Fees as an expense and the Issuers account for Interchange Fees as revenue.

94.    On the other hand, Acquirers do not receive, pay, or otherwise transmit Interchange Fees.  Accordingly, Acquirers do not account for Interchange Fees as an expense.

95.    In contrast to Interchange Fees, Acquirers do pay certain Network assessments. Such assessments are charged to the Acquirers, typically as part of a monthly invoice, and are paid directly by them, just like any other cost of doing business (e.g., electricity bills).

96.     Unlike Interchange Fees, which the Acquirers do not pay directly and do not treat as expenses, the Acquirers directly pay these Network assessments and treat them as expenses.

**5.     Defendants Have Used Their Price Fixing Schemes to Establish, Maintain, and Enhance Their Long-held Market Power.**

97.     As courts have repeatedly determined, Visa and MasterCard acquired substantial market power in the Payment Card markets using price fixing to induce Issuers to join the price fixing cartels.  For example, in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-342, the court found that Visa had market power in the market for Credit Card Network Services with a 47% share of the dollar volume of Credit Card transactions in the United States and that MasterCard's 26% share of dollar volume of Credit Card transactions was sufficient to demonstrate that it had market power in the market, and further determined that "[b]ecause Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers." There, the United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." *Id.*

98.     The Second Circuit affirmed this determination of market power, holding that "Visa, U.S.A. and MasterCard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc.*, 344 F.3d at 239.

99.     In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court confirmed the existence of barriers to entering the relevant product markets, reaffirmed that Visa had market power in the Credit Card market based on a finding that its market share fluctuated between 43% and 47%, and found that MasterCard's 26% to 28% market share was sufficiently high to go to a jury on the question of MasterCard's market power.  Visa's and MasterCard's shares of the Credit Card market have not changed significantly since these two holdings.

100.     The Debit Card market is dominated by Visa and MasterCard.  At the outset of the Damages Period, combined, Visa and MasterCard comprised approximately 75% of all Debit Card purchase volume.  Today, they comprise over 80% of that volume**.**

101.     Visa's and MasterCard's substantial market power is evidenced and protected by high barriers to entry.  *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d at 341 (finding that there are high barriers to entry into the Credit Card market.)

102.     To be a viable payment network competitor, a potential entrant would need both: (1) widespread, if not ubiquitous, merchant acceptance; and (2) large-scale distribution to consumers through Issuers.  While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear both barriers simultaneously.

103.     Merchants are generally unwilling to accept a Payment Card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a Payment Card brand that is not widely accepted by merchants.  Therefore, starting a new Network, whether Debit or

Credit Card, with sufficient scale to challenge Visa or MasterCard is extremely difficult.  These high barriers to entry, coupled with the entrenched dominance of Visa and MasterCard, explain in large part why no meaningful entry has occurred in the Credit Card and Debit Card markets since Discover entered nearly three decades ago in 1985.

104.    The United States Department of Justice's Antitrust Division highlighted this structural barrier to entry in the context of the Credit Card market in its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Co.*, No. 10-cv-4496-NGG-RER, Dkt. #5, at 7 (E.D.N.Y. Oct. 4, 2010):

> Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market.  Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders.  Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants.  Successful entry today would be difficult, time consuming, and expensive.

105.    Visa's and MasterCard's substantial market power has persisted throughout the Damages Period and remains intact today.  Also in the Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Co.*, No. 10-cv-4496-NGG-RER, Dkt. #5 (E.D.N.Y. Oct. 4, 2010), at 6, the U.S. Department of Justice Antitrust Division alleged that Visa and MasterCard possessed market power in the "network services market" for "General Purpose Cards" (i.e. general purpose credit and charge cards).  The non-discrimination restraints at issue in that case prevented merchants from "reducing [their] purchases of one network's services by encouraging [their] customers to choose a competing network's General Purpose Card."  *Id.* at 7.  Although a merchant could theoretically resist high acceptance fees by no longer accepting Visa's or MasterCard's Credit

Cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively constrain Defendants' market power because merchants cannot refuse to accept these General Purpose Cards without alienating customers and losing significant sales." *Id.*

106.    These determinations that Visa and MasterCard possessed substantial market power are supported by direct evidence of that power, including:  (1) Visa's and MasterCard's ability to raise Interchange Fees without the loss of merchant acceptance or transaction volume; (2) successful price discrimination, such as the price discrimination described above; (3) setting Interchange Fees unrelated to costs; (4) the ability to enforce anticompetitive policies; and (5) forcing merchants and consumers to accept inferior products, including products that are susceptible to fraud.

### a.      Ability to Raise Interchange Fees with Impunity

#### i.      *Visa*

107.    Starting in the 1970s, Visa has possessed and exercised substantial market power in the Credit Card Network Services market and that market power has increased significantly since then.  By the 1990s, Visa Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

108.    In the Credit Card Network Services market, Visa raised Credit Card Interchange Fees without merchants ceasing to accept Visa's Credit Cards.  In fact, Visa typically gained volume after these increases.  For example, during the Damages Period, Visa permitted Issuers to reclassify standard Visa Credit Cards as Premium Credit Cards and the Interchange Fees that

merchants paid for transactions made with such cards increased. Notwithstanding merchant opposition to these punitive price increases, no merchant dropped Visa as a result. Once a merchant begins to accept Visa Credit Cards, it is virtually impossible for it to stop.

109.    Visa has continued to possess by far the highest market shares and the highest number of Credit Cards in circulation throughout the Damages Period. Accordingly, most merchants must accept Visa Credit Cards to remain viable.

110.    At the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and then, throughout the Damages Period, Visa has exercised its substantial market power to increase PIN Debit Card Interchange Fees. Even with these price increases, Visa's debit volumes have increased during the Damages Period. As with Credit Cards, merchants cannot drop Visa's Signature Debit or PIN Debit Cards despite these significant price increases. Visa's ability to increase Interchange Fees without losing merchant acceptance or transaction volume directly evidences its market power in the Debit Card market.

111.    Visa's (and MasterCard's) substantial market power in the Debit Card market and the supracompetitive nature of Debit Card Interchange Fees were confirmed by the passage by Congress of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"), which required the Board of Governors of the Federal Reserve System (the "Federal Reserve") to enact regulations to ensure that Debit Card Interchange Fees for covered Issuers (i.e., banks with more than $10 billion in assets) are "reasonable and proportional" to Issuer costs. Section 920(a)(2) of the Electronic Fund Transfers Act (EFTA), 15 U.S.C. § 1693o-2(a)(2). In passing the Durbin Amendment, Congress made clear that the statute was designed to address Visa's and

MasterCard's ability to exercise substantial market power by raising Interchange Fees well above

cost.  Its principal author, Richard J. Durbin, made numerous statements to that effect on the

floor of the Senate, including:

> For years, Visa and MasterCard, and their big bank backers, have unilaterally
> fixed prices on the fees small businesses pay every time they accept a debit card
> from a customer.  The two giant card networks control 80 percent of the debit
> card market – that is Visa and MasterCard.  And it is no surprise that the debit
> interchange fees have risen, even as the price of processing the transaction has
> fallen… .  Finally, Visa, MasterCard, and the Wall Street banks will face some
> check against their unbridled market power in the credit and debit industries.

156 Cong. Rec. S5, 802-03 (daily ed. July 14, 2010).  Even though the Federal Reserve found

that most Issuers' costs were slightly above "par," to implement the Durbin Amendment, it

capped both Signature and PIN Debit Interchange Fees at $0.21 plus .05% plus an additional

$0.01 fraud-prevention adjustment.  *See Regulation II, Debit Card Interchange Fees and

Routing, Final Rule,* 76 Fed. Reg. 43,394 (July 20, 2011)(setting the cap); *Regulation II, Debit

Card Interchange Fees and Routing, Final Rule,* 77 Fed. Reg. 46,258 (Aug. 3, 2012)(adding the

fraud-prevention adjustment).  This cap substantially reduced the debit Interchange Fees that

prevailed for years due to Visa's and MasterCard's market dominance, but was still significantly

above cost for most Issuers and the Interchange Fees were higher than they would be if there was

active competition for merchant acceptance.  In fact, on July 31, 2013, Judge Richard Leon held

in *NACS, et al. v. Board of Governors*; Civil Case No. 11-02075 (D. D.C. July 31, 2013) that the

Federal Reserve Board's regulation did not comply with the intent of the Durbin Amendment

and, essentially, that the rates set by the regulation were still excessive.  Accordingly, even after

the imposition of maximum Interchange Fees levels pursuant to the Durbin Act, rue21 continues

to suffer damages by being forced to pay supracompetitive Interchange Fees on Visa and

MasterCard Debit Card transactions.

112.    Notably, despite this significant reduction in Debit Card Interchange Fees, few, if any, merchants chose to stop accepting Visa or MasterCard Credit Cards and Visa and MasterCard did not reduce their Credit Card Interchange Fees.  This further demonstrates Visa's and MasterCard's substantial market power.

### ii.    *MasterCard*

113.    Like Visa, MasterCard also has possessed and exercised substantial market power in the Credit Card Network Services market since the 1970s, and MasterCard's market power also has increased significantly over the years.  By the 1990s, MasterCard Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting MasterCard Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

114.    Like Visa, MasterCard has continually raised Credit and Debit Card Interchange Fees without losing merchant acceptance.  Like Visa, MasterCard has permitted Issuers to reclassify standard MasterCard Credit Cards as Premium Credit Cards dramatically increasing Interchange Fees paid for transactions.  Notwithstanding merchant opposition to these punitive price increases, few, if any, merchants have dropped MasterCard as a result.  Once a merchant begins to accept MasterCard Credit Cards, it is virtually impossible for it to stop.

115.    Also like Visa, and as described in paragraph 97 above, MasterCard's substantial market power in the Debit Card market and the supracompetitive nature of Debit Card Interchange Fees were confirmed by the passage by Congress of the Durbin Amendment and

subsequent regulatory and judicial findings.

116.    MasterCard's substantial market power is further evidenced by its ability to successfully charge merchants even higher Interchange Fees than Visa, even though MasterCard has lower market shares.  Throughout the Damages Period, MasterCard fixed Interchange Fees have been higher than Visa's.  MasterCard designed this strategy to compensate for its self-perceived inferiority to Visa in other dimensions that could make MasterCard less attractive to Issuers absent the higher Interchange Fees.  If it did not have substantial individual market power over merchants, MasterCard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

**b.    Price Discrimination**

117.    As the United States District Court for the Southern District of New York held, "Visa's and MasterCard's ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . .  Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants.  [Visa and MasterCard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet Merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions."  *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-31.  This price discrimination has occurred through the Damages Period and continues today.

###### c.      Setting Supracompetitive Prices Unrelated to Cost

118.    Visa and MasterCard did not set Interchange Fees based upon cost, as they would have done in a competitive market.  For example, with respect to the Debit Card market, as noted above, the Federal Reserve found in 2011 that Visa's and MasterCard's Signature Debit and PIN Debit Card rates were substantially above cost.  Visa's and MasterCard's ability to succeed in this conduct and profit from it is additional direct evidence of their substantial market power.

###### d.      Enforcement of Anticompetitive Rules and Policies

119.    Visa's and MasterCard's successful enforcement of anticompetitive rules and policies that have harmed merchants without losing merchant acceptance or transaction volume further demonstrates the substantial market power that Visa and MasterCard have in the Payment Card markets.  Despite the adverse economic impact of these rules and policies on merchants, given Visa's and MasterCard's substantial market power, merchants cannot afford to stop accepting Visa or MasterCard transactions and no Issuer has left the cartels.

###### e.      Forcing Merchants and Consumers to Accept Inferior Products

120.    Visa's and MasterCard's success in forcing merchants and consumers to accept and use technologically-inferior products, including products that Visa and MasterCard knew would increase fraud, is further evidence of their substantial market power.  Visa and MasterCard could have dramatically reduced Payment Card fraud in the United States during the Damages Period by adopting new card technology to replace the decades-old, fraud-prone magnetic stripe technology they have forced merchants and consumers to use, only recently beginning to implement the more secure EMV (short for Europay, MasterCard and Visa, the original developers) chip technology.  The United States is one of the last countries to migrate towards EMV chip technology.   Instead, Visa and MasterCard succeeded in shifting most of the

cost of fraud losses to merchants in this country through the implementation of various compliance programs and liability rules, including the chargebacks, fees, and fines. They did so because they and their Member Banks profit from fraud which creates a pretextual justification for high Interchange Fees. Visa and MasterCard also profited from fraud through punitive fines and fees for data breaches, another manifestation of their substantial market power.

121.    Visa and MasterCard have long recognized that the magnetic stripe technology that their Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud prone. Yet Visa and MasterCard have perpetuated the use of magnetic stripe technology by, among other things, delaying the implementation of more secure technologies. As a result, the United States has experienced the highest fraud rates, with the gap growing.

122.    This is a direct result of the conspiracies and unlawful conduct detailed in this Amended Complaint. Despite the availability of technology to reduce fraud (for example, EMV chip technology has been the standard in the United Kingdom since approximately 2005), Visa and MasterCard had no incentive to adopt it in the United States or compete on this basis because they could shift fraud-related costs to merchants and thereby profit from fraud while insulating the banks from its costs. Visa's and MasterCard's ability to impose inferior quality card products and to permit preventable fraud during the Damages Period is further direct evidence of their substantial market power.

123.    To the extent that rue21 has been forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages caused by the conspiracies complained of herein.

124.    Visa's and MasterCard's substantial market power continues, and has even

increased, throughout the Damages Period.  In fact, despite its substantial size and status in the retail market, rue21 cannot drop Visa or MasterCard Credit or Debit Cards without losing an unacceptable number of sales.

### 6. The MasterCard and Visa IPOs Were Changes in Corporate Form that Maintained and Enhanced the Cartels.

125.   The Member Banks that sat on the Visa and MasterCard boards and controlled them approved MasterCard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs.  These Member Banks took advantage of their direct control over pre-IPO Visa and MasterCard to agree to post-IPO structures for Visa and MasterCard that were designed to perpetuate, and to not disturb, the anticompetitive conduct detailed in this Amended Complaint.

126.   The Defendants repeatedly reassured their investors, employees and Member Banks that the IPOs would not cause significant change, other than with respect to antitrust liability.  This included assurances that existing contracts and rules would continue to govern and the post-IPO corporate structure would not alter the way Interchange Fees are set.

127.   These IPOs were, in large part, a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and MasterCard's organizational structures as associations of competing Member Banks.  *See, e.g.*, MasterCard Incorporated Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73 (noting that MasterCard had "faced heightened regulatory scrutiny and legal challenges in recent years.").

128.   In response to these legal and antitrust challenges, Defendants and the Member Banks that sat on their boards decided to change the organizational structures of Visa and

MasterCard in order to attempt to evade antitrust liability through superficial changes in corporate form. However, in undertaking these actions, the Member Banks of Visa and MasterCard agreed prior to the IPOs that post-IPO Visa and MasterCard would continue to support the agreements not to compete and to fix prices.

129.    They implemented this agreement by structuring the IPOs so that they cosmetically changed the corporate forms, but kept the anticompetitive conduct intact.

130.    Pre-IPO, these Member Banks conspired through Visa's and MasterCard's governing boards and/or their ownership of Visa and MasterCard to control every aspect of Visa's and MasterCard's businesses, including agreeing to fix Interchange Fees through ratification of the default Interchange Fee schedules and agreeing to set Visa's and MasterCard's rules, including maintaining the Honor All Issuers rules.

131.    Post-IPO, Visa and MasterCard act as the pricing and rules enforcement agents of their Member Banks. Through the corporate restructuring and subsequent IPOs, all Visa and MasterCard Member Banks effectively delegated to Visa and MasterCard in perpetuity the ability to fix the banks' pricing to merchants. Each knew that all other Visa and MasterCard Member Banks were also delegating their pricing decisions to Visa and MasterCard, which arrangement was ratified by a horizontal agreement of Visa's and MasterCard's Member Banks when they voted to approve Visa's and MasterCard's restructurings on these bases.

132.    Moreover, as part of the corporate reorganizations leading to the IPOs, the Member Banks reaffirmed and effectively readopted each Network's rules, including the default Interchange Fee and Honor All Issuer rules. Thus, each Member Bank's approval of this scheme was done knowing that all other Visa and MasterCard Member Banks' Interchange Fees would

be set by the Defendants and all Member Banks would continue to abide by the Honor All Issuers rules.  This common scheme by horizontal competitors was and is a continuing violation of Section 1 of the Sherman Act whereby the Defendants continue to set, at supracompetitvely high rates, the default Interchange Fees for thousands of competing banks that otherwise would compete for merchant acceptance.

133.    As described above, this was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  The end result was the same as before the IPOs:  Visa and MasterCard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance.

134.    The IPOs increased the effectiveness of the price fixing conspiracies as well as Visa's and MasterCard's substantial market power by consolidating decision-making and coordinating communications among conspirators.

135.    The anticompetitive effects of these ongoing conspiracies continue to harm merchants and consumers.  The Member Banks continue to adhere to the rules at issue, without exception, and Visa and MasterCard continue to wield substantial market power over merchants as a result.  In this regard, Visa and MasterCard and their Member Banks understood before the IPOs were consummated that if Visa and MasterCard maintained the cartels' basic rules and structures, no bank would break rank and compete for merchant acceptance.  That is precisely what happened.

136.    The Defendants' post-IPO conduct confirms that the IPOs did not terminate the price fixing cartels or reduce Visa's and MasterCard's substantial market power.  Visa's and

MasterCard's anticompetitive rules, including the restraints at issue in this Amended Complaint, have remained the same.  Visa and MasterCard have exercised their substantial market power by, among other actions, imposing new network fees that merchants must pay.  Visa has engaged in a campaign to maintain its substantial market and monopoly power in the General Purpose Debit Card market.  Perhaps most significantly, Visa's and MasterCard's Interchange Fees have remained at supracompetitive levels since the IPOs.  This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

137.    Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct.  In 2007, the European Commission's Competition Directorate issued a written determination that MasterCard's members had simply agreed to appoint MasterCard as their cartel manager to act in their collective best interest in setting Interchange Fees.  The Competition Directorate's comprehensive decision found as follows:

> MasterCard's viewpoint that the IPO . . . had changed the organization's governance so fundamentally that any decision of MasterCard Incorporated's Global Board no longer qualifies as [a] decision of an association [of its Member Banks] but rather as [a] "unilateral" act which each Member Bank bilaterally agrees to abide by, cannot be accepted. . . . MasterCard's Member Banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The Member Banks effectively "outsourced" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . after MasterCard's management assured them that the banks' interests will continue to be preserved under a new "enhanced customer approach" and via the local input of the banks in the decision making.  It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the Member Banks legitimately expected and

> therefore agreed that this Board would henceforth set the MIF in a manner that is
> in their common interest.

European Commission Decision, COMP/34.579, at ¶¶ 357, 378-379 (Dec. 19, 2007) (footnotes

omitted).

138.    The fact that a majority of MasterCard's post-IPO directors were "independent"

did not change the role of MasterCard as the "outsourced" pricing agent and manager of the

members' Interchange Fee cartel:

> The circumstances that members of the Global Board are "independent" within
> the meaning of the NYSE criteria . . . is not a decisive question for there to be an
> association of undertakings.  As an organization's members entrust decision
> making power to a common body with the expectations that the body's
> subsequent coordination of their competitive behavior will occur in the common
> interest of the members, the independence of such body is no obstacle to
> qualifying its decisions as decision[s] of an association of undertakings.

*Id.* at ¶ 381.   Moreover, "[d]evelopments after the IPO also indicate that MasterCard's

management takes into account concrete banks['] interests in setting the level of fallback

interchange fees."  *Id.* at ¶ 389.

139.    In May 2012, the European General Court affirmed the Commission's

conclusions:

> [T]he Commission was legitimately entitled to take the view, in essence, that
> despite the changes brought about by MasterCard's IPO, the MasterCard payment
> organization had continued to be an institutionalized form of coordination of the
> conduct of the banks.  Consequently, the Commission was fully entitled to
> characterize as decisions by an association of undertakings the decisions taken by
> the bodies of the MasterCard payment organization in determining the MIF.

*MasterCard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 259 (May 24, 2012).

"[W]ith regard to merchants, what [MasterCard and its Member Banks] sought [post-IPO was] essentially the maximum threshold of their tolerance to the price of card transactions." *Id.* at ¶ 257.  The European General Court was  upheld by Europe's highest court, the Court of Justice.  *See* Judgment of the Court (Third Chamber) of Sept. 11, 2014, in the Case C-382/12 P, MasterCard and Others v European Commission, [2014] n.y.r.

### 7.    Defendants' Price Fixing Schemes Also Are Unlawful Vertical Price Restraints.

140.    The Interchange Fee price fixing schemes adopted by Defendants also constitute anticompetitive and unreasonable vertical price restraints.  Visa and MasterCard entered into express vertical agreements with each of their Member Banks, binding all of their Member Banks to comply with the rules and regulations of their Networks, including the rules at issue in this Amended Complaint.  In turn, Visa and MasterCard each acts as the enforcement agent and holds issuing and acquiring members responsible for compliance with the rules.  These two sets of vertical price restraints, one for Visa and its Member Banks and the other for MasterCard and its Member Banks, have continued in full effect during the Damages Period, including after Visa's and MasterCard's IPOs.

141.    For example, Rule 1.3 of the July 15, 2011 MasterCard Rules states:   "[a]n applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as:  "[t]he Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended from time to time."  *See Definitions,*

*MasterCard Rules* (July 15, 2011).  Similarly, the "General Overview" of the April 10, 2011 Visa International Operating Regulations states:  "[t]he Visa International Operating Regulations are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members."  Visa's current rules contain virtually identical language.  *See* Introduction, Visa Core Rules and Visa Product and Service Rules (April 16, 2016).

### E. Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification.

142.    Although Defendants have argued in the past that Interchange Fees are cost-based and necessary mechanisms to reimburse Issuers to motivate them to issue Credit or Debit Cards, the facts show otherwise.

143.    Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Payment Card Networks can thrive without Interchange Fees.

144.    Moreover, the Interchange Fees set by Defendants are not based on cost.

145.    There is no procompetitive justification for Interchange Fees to offset anticompetitive harm caused by anticompetitive conduct detailed in this Amended Complaint.

### 1. Banks Would Profit From Issuing Debit Cards Even Without Collectively-set Interchange Fees.

146.    Debit Cards have long been positioned by Visa and MasterCard and their Member Banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero interchange) for decades.  As such, Issuers have strong economic incentives to issue Debit Cards

even without income from Interchange Fees.  Debit Cards provide numerous economic benefits to Issuers that justify their issuance even without Interchange Fees.  These benefits include: (1) savings relative to the costs of processing checks and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuers to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of Debit Cards enhances and deepens an Issuer's valuable relationship with its customers.

147.    When banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they paid merchants to provide debit services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided debit services "at-par."  The market for Debit Card Network Services expanded substantially during the time of Issuer-paid and at-par interchange.  This model prevailed until the early 1990s, when it changed only because Visa and MasterCard extended their cartels into debit.

148.    Beginning in the early 1990s, Visa and MasterCard aggressively began to implement and enforce a strategy to leverage their substantial market power in the Credit Card market and force merchants to pay supracompetitive Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants that accepted Visa's and MasterCard's dominant Credit Cards to also accept the networks' Signature Debit Card transactions.  Visa and MasterCard set the same or similar Interchange Fees for Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions.  Merchants had no choice but to accept Visa's and MasterCard's dominant, supracompetitively-priced Credit Card products and, therefore, were forced to accept supracompetitive Signature Debit Card Interchange Fees.

149.    Visa and MasterCard then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy and thereby entrench their dominance in the Debit Card market.  This strategy successfully destroyed the at-par model that had prevailed for debit prior to the 1990s as Visa and MasterCard had intended.  Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and MasterCard and to suppress the safer, cheaper and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as NYCE and STAR.

150.    The substantial non-interchange economic benefits of issuing Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment.  Addressing that impending regulatory cap, the CEO of Citigroup said: "We don't have much of an impact on debit card interchange or overdraft fees.  Those are really small impacts on us."  Citigroup Inc. Q4 2010 Earnings Call Transcript (Jan. 18, 2011).  The Chairman and CEO of City National Corporation predicted:  "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material."  City National Corporation Q4 2010 Earnings Call Transcript (Jan. 20, 2011).  TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on Debit Card Interchange Fees.  Transcript to TCF Financial Corp.'s Conference Call, TCF Discusses Lawsuit Challenging Durbin Amendment (Oct. 12, 2010).

151.    The facts that Debit Card issuance continues to be profitable and Debit Card volumes have increased since Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011 reinforce the conclusion that Debit Card Interchange Fees

had been fixed at supracompetitive levels.

152.    The experience in other industrialized countries also highlights that the development of debit in the United States was a function of anticompetitive conduct in the Debit Card industry in this country.  Virtually all countries with the highest debit usage, including Canada, Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway, utilize an at-par interchange pricing model.  For example, the Canadian debit system has always been based on at-par pricing, and Canada has traditionally had higher per capita debit usage than the United States, as well as higher debit penetration in merchant categories that do not accept PIN Debit Cards in the United States.

153.    The vast and successful U.S. checking system also demonstrates that Interchange Fees are not necessary for a Debit Card Network to function.  Since 1916, by rule of the Federal Reserve, trillions of dollars of checks drawn on the U.S. national banking system have cleared at par.  Despite this prohibition on Interchange Fees, banks have continued to offer checks to their customers and have continued to accept and cash checks issued by other banks.

**2.      Banks would profit from issuing Credit Cards even without collectively set Interchange Fees.**

154.    In the 1980s, the default Interchange Fee rules were rationalized as being necessary to give Credit Card Issuers incentives to issue such cards.  By 1990, it was apparent that Credit Card Issuers were earning substantial profits from interest rates on revolving balances and annual fees, and therefore Interchange Fees were unnecessary to encourage issuance.  Since then, the evidence has continued to show that Credit Card Issuers can be profitable without collectively-set Interchange Fees.

155.    International experience regarding Interchange Fees on Credit Card transactions also indicates that Interchange Fees in the United States have been fixed at supracompetitive levels.  In Australia, the Reserve Bank of Australia regulated Visa's and MasterCard's Credit Card Interchange Fees during the past decade.   Those regulations mandated a nearly 50% reduction (to an average of 50 basis points) of those Interchange Fees, rates that are much lower than those that have prevailed in the United States during the Damages Period.   Prior to enactment of these regulations, Visa and MasterCard argued that such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry.   In reality, no such collapse occurred.   Visa's and MasterCard's Credit Card volumes have increased in Australia since the regulations went into effect.   Indeed, the European General Court recently reviewed the evidence from Australia and concluded "[i]t is clear . . . that a substantial reduction in the MasterCard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability."   *MasterCard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 111 (May 24, 2012), upheld in Judgment of the Court (Third Chamber) of Sept. 11, 2014, in the Case C-382/12 P, MasterCard and Others v European Commission, [2014] n.y.r.

156.    Similarly, the European Commission undertook a comprehensive study of Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by MasterCard's and Visa's European affiliates.  In 2002, the Commission and Visa reached a settlement that lowered Interchange Fees first to 0.7%, and then to a cost-based standard if lower.   This commitment expired in 2007, and the Commission began a new investigation, which continues.  Following Visa's 2002 commitment to limit consumer Credit Card Interchange Fees to 0.7%, Visa announced in May 2013 that it would

limit Interchange Fees to 0.3%.   In 2007, the Commission found MasterCard's setting of Interchange Fees to be unlawful, and MasterCard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision. For years, therefore, the resulting European Interchange Fees have been substantially below those in the United States that often exceed 2.00% due to the proliferation of Premium Credit Cards.   Again, there have been no adverse effects and Visa's and MasterCard's Credit Card volumes in Europe have increased during this period.

157.   In neither Australia nor the European Union do Visa and MasterCard enjoy the economies of scale and scope associated with the much larger Payment Card markets in the United States.   Visa's and MasterCard's Credit Card Interchange Fees in the United States are higher than nearly every other Credit Card Network outside the United States, including Visa's and MasterCard's own Networks in other countries.

158.   The costs associated with issuing Visa and MasterCard Credit Cards have declined dramatically since 1990.   Issuer costs of funding a cardholder's grace period, known as "float costs," have fallen significantly.   Visa and MasterCard Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

159.   Notwithstanding these declines in Issuer costs, however, Visa and MasterCard have substantially raised their Interchange Fees.   For example, Visa has raised the Interchange Fees and/or costs of acceptance applicable to Visa Credit Card transactions throughout the

Damages Period.  MasterCard has done the same.  This demonstrates that Interchange Fees are not based on costs, but rather are a cartel's anticompetitive exercise of market power.  The fact that these fees have cemented the banks' adherence to the agreement not to compete for cardholders further reinforces this conclusion.

160.    Visa and MasterCard have argued that default Interchange Fees are justified because, as a result of their Honor All Issuers rules, an individual Issuer could otherwise potentially "hold up" merchants that accept Visa's and MasterCard's Payment Cards by charging as high an Interchange Fee as that Issuer wishes.

161.    This "hold-up" problem is the result of the banks' anticompetitive agreements not to compete for merchant acceptance, *i.e.*, the Honor All Issuers rules.  Attempting to justify Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is self-serving, self-fulfilling and perverse.  An agreement not to compete is not a justification for anticompetitive conduct.  It is itself anticompetitive conduct.

162.    Moreover, these schemes create an enormous amount of anticompetitive harm. Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive problem created by the schemes themselves) was credited as a procompetitive benefit, which it should not be, any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Amended Complaint.

**3.      Anti-steering Rules Hid the Costs of Visa and MasterCard Transactions From Consumers, Thereby Inhibiting Competition From Other Networks and Reinforcing the Visa and MasterCard Cartels.**

163.    In a competitive world, some merchants could have used financial incentives and marketing to steer customers to other Networks or forms of payment and, by increasing customers' price sensitivity to Interchange Fees, steering could have  to network competition. Visa and MasterCard  prevented this from happening by enforcing anti-steering rules that prohibited merchants from making the cost of Visa and MasterCard transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

164.    During the Damages Period, the anti-steering rules included Visa's and MasterCard's rules that prohibited merchants from offering discounts to consumers that used Payment Cards that were less expensive than Visa or MasterCard Payment Cards.  These rules remained in effect until Visa and MasterCard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the U.S. Department of Justice's Antitrust Division.

165.    Visa and MasterCard, however, still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa or MasterCard Payment Cards instead of more expensive Visa or MasterCard Payment Cards issued by other banks.   Such discounting by Visa or MasterCard Issuer would force Visa and MasterCard Member Banks to compete for merchant acceptance.

166.    The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on Credit Cards.  Because of the way the Debit Card industry developed, with most cards originating as ATM/PIN Debit Cards, Debit Cards have

long had multiple network linkages or "bugs" on them, and that has facilitated the most effective form of steering for merchants, namely, routing transactions to cheaper Payment Card Networks. There is no technical reason why multiple network functionality could not co-reside on Credit Cards.  Visa and MasterCard rules, however, have blocked that from happening throughout the Damages Period.

167.    The anti-steering restraints also include the rules that prevent merchants that accept Visa and MasterCard from testing differential acceptance or new ways to steer transactions to cheaper Payment Card Networks at certain locations that operate under a single banner.  That is the way many merchants pilot new products, and such testing would have enabled merchants to introduce new ways to force the banks to compete for merchant acceptance.

168.    The anti-steering rules also included Visa's and MasterCard's prohibitions against surcharging their transactions.  Visa's previous no-surcharge rule (*see, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008)) provided that "[a] Merchant must not…[a]dd any surcharge to [t]ransactions."  MasterCard's previous no-surcharge rule (*see, e.g.,* Rule 5.9.2, *MasterCard Rule* (Oct. 2008)) similarly provided that "[a] Merchant must not directly or indirectly require any [MasterCard] Cardholder to pay a surcharge or any part of any Merchant discount."  The proposed settlement in MDL 1720 would have modified these rules to permit surcharging of Visa and MasterCard Credit Card transactions in limited circumstances[3].  Even under the proposed settlement, the no surcharging rules would have remained in place for Visa and MasterCard Debit Card transactions.  According to the

---

[3] See *Definitive Class Settlement Agreement*, ¶¶ 42 (Visa), 55 (MasterCard)

Second Circuit, despite the ability to surcharge being the "most consequential relief afforded the (b)(2) class, . . . [t]he incremental value and utility of this relief is limited[4]" *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.* 827 F.3d 223, 229.   As a result of the Second Circuit's Opinion, the no-surcharging rules remain in place for Visa and MasterCard Debt Cards transactions.  *See, e.g.*, Visa Rule 1.5.5.2 (Surcharges), Visa Core Rules and Visa Product Service Rules (April 16, 2016); MasterCard Rule 5.11.2 (Charges to Cardholders), Chapters 5 and 16, MasterCard Rules (July 7, 2016).

169.   Under the Defendant's current anti-surcharging rules, merchants accepting American Express Credit Cards, including rue21, must limit their surcharging of Visa and MasterCard Credit Cards to the same terms that American Express limits surcharging of American Express Credit Cards.   *See, e.g.*, Visa Rule 5.6.1.2 (Similar Treatment of Visa Transactions—US Region and US Territories), Visa Core Rules and Visa Product and Service Rules (April 16, 2016); MasterCard Rule 5.11.2.1 (Brand-Level Surcharing), Chapter 16, Additional U.S. Region and U.S. Territory Rules, MasterCard Rules (July 7, 2016).

170.   American Express prohibits surcharging its credit cards unless all payment cards, including debit cards, are equally surcharged, but the Defendants do not permit debit card surcharging.   To avoid this effective bar against surcharging, rue21 would have to cease accepting American Express credit cards.  This effectively prohibits credit card surcharging by any merchant that accepts American Express; approximately 90% of merchants by U.S. credit

---

[4] As the Second Circuit noted, "[a] significant portion of merchants in the (b)(2) class are either legally or commercially unable to obtain incremental benefit from the primary relief negotiated for them by their counsel . . ."  The injunctive relief was inadequate for three primary reasons—surcharging is prohibited by state law in several states; merchants who accept Visa and MasterCard competitors who prohibit surcharging (such as American Express) would not have been permitted to surcharge; and all injunctive relief was scheduled to terminate on July 20, 2021, despite merchants remaining bound by the settlement's release in perpetuity.

card volume. Those merchants that do not accept American Express are unlikely to surcharge and risk losing sales to competing merchants who accept American Express and therefore cannot surcharge. If a substantial number of merchants would cease accepting American Express to avoid the bar against surcharging, it would reinforce and strengthen the Defendants' substantial market power.

171.    At the time the Defendants agreed to these revised anti-surcharging rules, they knew and intended that they would effectively prohibit surcharging. Additionally, they each knew that prohibiting surcharging would inhibit competition. Such a horizontal agreement to restrain price competition is per se unlawful.

172.    There were and are no procompetitive justifications for these anti-steering rules. If merchants had not been restrained by these rules, some could have played Visa and MasterCard or the Member Banks against one another by steering or threatening to steer customers away from using more expensive Visa and MasterCard Payment Cards. Were it not for the restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or MasterCard or from Issuers. As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

**F.    The Visa Defendants Engaged in Additional Anticompetitive Conduct That Monopolized or Attempted to Monopolize, the General Purpose Debit Card Services Market**

173.    The Visa Defendants' have engaged in anticompetitive conduct, in addition to the Interchange Fee price-fixing described above. They have also engaged in conduct designed to monopolize the market for Debit Card Network Services.

174.    Visa's monopolistic behavior has suppressed competition in the market and thereby injured rue21 by enabling Issuers to charge higher Interchange Fees and Visa to charge higher network fees than would prevail in a competitive market.

175.    The exclusionary acts have forced inferior technology, such as magnetic-stripes and signature authentication, which is significantly less secure and more prone to fraudulent transactions than PIN authentication.  rue21 has been harmed by these exclusionary acts in that it has been forced to bear additional costs as a result of the fraudulent transactions.

### 1.    Visa's Strategy to Maintain Its Monopoly in the Debit Card Market.

176.    At the beginning of the Damages Period, in 2004, Visa possessed a monopoly in the Debit Card market.  Its share of that market was approximately 60% and it possessed 80% of the Signature Debit  Card segment.  By early 2004, Visa entered into long-term agreements with the majority of its large Issuers that "prevent[ed] Visa banks from switching to MasterCard."  At the time Visa and MasterCard were the only Signature Debit Card networks.  *United States v. Visa U.S.A., Inc..*, No. 98-cv-7076 (BSJ), 2007 WL 1741885, at 2 (S.D.N.Y. July 2007).  Those agreements and the existing base of Visa branded Debit Cards enabled Visa to maintain its monopoly even after it was forced to alter some of its conduct by the antitrust settlements in *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238 (JG) (E.D.N.Y.)

177.    By 2005, Visa's Interlink network became the leading PIN Debit Card network, capturing 36% of that segment of the Debit Card market.  Visa has maintained its dominant position in both the PIN and Signature Debit markets throughout the Damages Period.  Visa entered into numerous exclusive agreements with debit Issuers which made Interlink the

exclusive or primary PIN Debit Card acceptance mark on over 100 million Debit Cards. Visa's large share of Signature Debit transactions incentivized the banks to exclude competing PIN Debit Card networks from the banks' Debit Cards. These agreements permitted Visa to raise Interchange Fees during the Damages Period. Even if a merchant had dropped Interlink and its high rates, that merchant would still pay more as transactions defaulted to the Visa Signature Debit Card rates. Many Visa Debit Cards provided no other routing options.

178.    Visa utilized its monopoly to restrain PIN Debit competition throughout the Damages Period. Visa continued to raise Interlink's Interchange Fees which forced competing PIN Debit Card networks to raise their rates to maintain volume with Issuers in the market that was dominated by Visa. The result was a convergence of PIN Debit Card and Signature Debit Card rates at high ad valorem prices, a trend that contributed significantly to suppressing PIN Debit Card acceptance in the United States. With Signature Debit Card and PIN Debit Card Interchange Fees aligned, merchants' ability to install PIN pads (in order to accept PIN Debit Cards) was reduced, further protecting Visa's dominance in Signature Debit.

179.    In PIN Debit alone, as a result of Visa's conduct, effective Interchange Fee increased an estimated 234% between 1998 and 2006. Merchants,  including rue21, were harmed as a result of these supracompetitive increases.

## 2.  Visa Has Sought to Maintain Its Monopoly in the Debit Card Market Since the Passage of the Durbin Amendment

180.    The Durbin Amendment sought to stimulate competition in the Debit Card market. The amendment and the regulations subsequently promulgated by the Federal Reserve

capped Debit Card Interchange Fees and required that all Debit Cards bear an unaffiliated network on each card.

181.    Merchants now had the right to control the routing of Debit Card transactions. Once debit cards were linked to two competing networks, merchants could use their routing rights to ensure that the networks competed for merchant volume.  This requirement exposed Visa to potential competition which would have forced it to reduce Interchange Fees and network fees in order to incentivize merchants' routing decisions.

182.    Faced with these material threats to its monopoly, Visa began another anticompetitive campaign to thwart  the competition that the Durbin Amendment was designed to open.  Visa imposed the Fixed Acquirer Network Fee ("FANF"), which forces merchants to route Debit Transactions to Visa and away from PIN Debit Card networks, if the merchant accepts Visa Credit Cards (which rue21 must because of Visa's substantial market power).  The FANF effectively revives the anticompetitive tie-in of Visa Debit Cards to Visa Credit Cards.

183.    The FANF, effective April 2012, is nothing more than a substantial price increase on merchants that Visa is strategically using as a lever to gain Debit Card routing agreements with merchants.  If the merchant accepts any Visa Payment Card transactions, credit or debit, the merchant must pay a fixed fee to "access" Visa's networks, and perversely, the more locations the merchant operates the greater the fee it has to pay.  This construct restores the tie between Debit Card acceptance and Credit Card acceptance that Visa previously utilized as the lynchpin of its strategy to dominate the Debit Card market.  It does so because the only way merchants can avoid the fee is to drop all Visa products (which they cannot do because of Visa's substantial market power in the Credit Card market), and the only way merchants can mitigate the fee is to route Debit Card volume to Visa under routing agreements.  The FANF further penalizes a

merchant for routing a transaction over a competing PIN Debit Card network because, if the merchant did, then it would not be able to reduce the fees it must pay for Visa transactions by shifting volume to Visa.  In fact, because the merchant must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant will, in effect, pay twice for the transaction if it routes the transaction to a competing PIN Debit Card Network.

184.    The FANF maintains Visa's monopoly by compromising the competing PIN Debit Card networks' ability to compete by neutralizing the competitive dynamic that should have resulted from the Durbin Amendment.  While Visa leveraged its power in the Credit Card market to distort competition in the Debit Card market with the FANF, the competing PIN Debit Card networks could not (and cannot) do that.  They could not tie Debit Card network acceptance to a dominant Credit Card Network, and, if they tried to implement such an onerous fee, merchants would have stopped accepting the Debit Cards.  As a result, Visa gained debit routing agreements with merchants that the competition could not (and cannot) match. Simultaneously, Visa entered into routing agreements with large Acquirers under which the Acquirers routed transactions nearly exclusively through Visa for transactions originating at merchants not already covered by Visa's individual merchant routing agreements.  As a result, Visa achieved volumes, not because it had/has better Debit Card Networks but because it had/has the power to use a tying arrangement and an anticompetitive fixed fee to foreclose competition.

185.    Additionally, Visa implemented and exploited EMV technology to subvert competition from PIN Debit Card networks.

186.    For years, Visa abetted the fraud-prone payment system in the United States to the detriment of consumers and merchants, including rue21.  In a recent public filing, Visa has admitted that the magnetic-stripe system it (and MasterCard) had maintained in the United States

exposed the payment system to counterfeit fraud. *See* Answer & Counterclaims of Visa U.S.A., Inc., Doc. No. 28 at 24, ¶ 35, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, Index No. 652530/2016 (Sup. Ct. N.Y. County, June 29, 3016).

187.     Outside of the United States, beginning as early as 1994, the Defendants utilized "chip-and-pin" cards which have both data encryption on a microchip embedded in the card (which inhibits the counterfeiting that plagues magnetic-stripe cards), and require the cardholder to enter a PIN (which inhibits the use of counterfeit, lost or stolen cards).   For years, the Defendants purposely delayed adopting this technology in the United States.

188.     After the passage of the Durbin Amendment in 2010, Visa changed course and decided to push EMV, despite its recognition that better solutions existed in the marketplace. Spurred by the Durbin Amendment's threat to Visa's monopoly in the market for Debit Card Network Services, Visa devised a scheme to force merchants to incur what Visa previously characterized as REDACTED which Visa could force on merchants because of its substantial market power.

189.     Visa did so to, among other things, implement and exploit EMV technology in order to control transaction routing and subvert the competition among Debit Card networks that the Durbin Amendment was designed to foster.

190.     The Durbin Amendment capped Debit Card Interchange Fees for large banks, and the cap did not distinguish between Signature Debit Card Interchange Fees and PIN Debit Card Interchange Fees.   Faced with projections of large declines in Interchange Fee revenue, Visa's large Debit Card Issuers demanded that Visa shift Debit Card fraud liability to merchants. Critically, only fraud liability for Signature Debit Card transactions was shifted.   Signature Debit fraud was 10 times that of PIN Debit fraud.   Visa knew that imposing liability for Signature

Debit fraud on merchants, as Visa's banks demanded, would drive increased PIN Debit adoption and steering by merchants.  While such steering would have been beneficial to cardholders as it would have promoted the significantly safer PIN Debit, it was problematic for Visa because it could have undermined Visa's debit monopoly and cost Visa billions in revenue.

191.    The threat to Visa's monopoly was exacerbated by competing PIN Debit Card networks' developments of "PINless" Debit, which does not require the entry of a PIN for transactions under a certain amount.  PINless Debit has the potential to significantly expand the number of transactions touted to Visa's PIN Debit Card network competitors, transactions for which PIN Debit has traditionally been unavailable.  Visa's competitors also were developing Signature Debit capabilities, and the combination of PINless Debit and Signature Debit would have enabled them, for the first time, to compete for merchant routing on all Debit Card transactions.   But to support its post-Durbin monopolization strategy, Visa entered into agreements with Issuers to incentivize or require them not to implement PINless Debit from PIN Debit Card networks, such as STAR and PULSE.

192.    With its monopoly under threat, Visa devised a scheme to force U.S. migration to EMV technology in order to blunt the emerging threats to its monopoly power.  In August 2011, shortly after the Durbin Amendment regulations were finalized, Visa announced that, effective October 2015, liability for counterfeit fraud transactions, both credit and debit, would shift from Visa's banks to non-EMV-capable merchants for counterfeit fraudulent transactions on EMV issued cards.  This liability shift applied to all Visa transactions (except for those completed at gas station pumps).  Visa's market power in both the Credit Card and Debit Card markets forced other networks, including MasterCard, to follow Visa's lead.   MasterCard subsequently announced a substantially similar liability shift, taking effect in October 2015.

193.    The Defendants' plan for migration to EMV forced merchants, including rue21, to undertake the massive, and otherwise unnecessary, expenditure of replacing their point-of-sale hardware and software with new EMV terminals—despite the existence of better technologies to secure the United States payment system.  Visa forced EMV technology on rue21 knowing that there would be significant costs and that the Acquirers and processors that support merchant acceptance of Visa transactions could not enable compliance by the vast majority of merchants before the October 2015 deadline.  Visa was able to exploit the rush to implement EMV technology to ensure that its proprietary EMV technology would become the industry standard, instead of competing open technologies that would have been configured to stimulate meaningful competition in the debit market.

194.    Visa, tellingly, implemented EMV technology without requiring the entry of a PIN for all EMV transactions.  According to data from the Federal Reserve, lost and stolen card fraud, which authenticating the transaction using a PIN prevents, accounts for a substantial portion of the fraud losses that consumers pay.  Visa has recently admitted that lost and stolen fraud constitutes approximately 10% of overall payment fraud.  *See* Answer & Counterclaims of Visa U.S.A. Inc., Doc. No. 28 at 15, ¶ 4, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*  Index No. 652530/2016 (Sup. Ct. N.Y. County, June 29, 2016).

195.    Despite knowing the EMV technology without a PIN is not as effective at combating fraud, Visa continues to expose merchants and cardholders to unnecessary risk in order to protect its monopoly in the market for Debit Card Network Services.

196.    As a result of its deliberate conduct, Visa has maintained a monopoly throughout the Damages Period.  Its share of the Debit Card market remains at  monopolistic levels and is poised to increase as EMV is forced on merchants.  Interchange Fees paid to Issuers remain at

supracompetitive levels despite the Durbin Amendment.   Visa's ability to impose supracompetitve and economically unjustified network access fees further reflects its continuing monopoly power.   Visa's dominance of the market with the fraud-prone Signature Debit and ability to maintain that dominance during the migration to EMV is further evidence of its continuing monopoly power.

### G.   Antitrust Injury

197.   Defendants' and their Member Banks' price fixing cartels and conduct as otherwise   described herein   have caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of Payment Card Network Services in the form of inflated Interchange Fees paid directly by those merchants, including rue21, foreclosure of network competitors, and reduced output.  Merchants and their customers have borne and continue to bear the brunt of hundreds of billions of dollars of supracompetitive fees and severely decreased consumer welfare.

198.   rue21 has suffered direct antitrust injury from Defendants' conduct in violation of the antitrust laws set out above.  From 2004 to the present, rue21 had had contracts with Acquirers under which it directly pays the applicable Interchange Fee to the relevant Issuer with respect to transactions in which rue21 accepted a Defendant's Payment Card as a method of payment.  As a result, rue21 paid, and continues to pay, substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Amended Complaint.  rue21 was, and continues to be, deprived of the benefits of competition limited by this conduct in the relevant markets.

199.   Because the supracompetitive Interchange Fees that rue21 and other merchants have had to pay were a substantial cost of doing business, rue21 and other merchants were forced

to raise retail prices charged to their customers, to reduce retail services provided to their customers as a means of offsetting these Interchange Fees, and/or to reduce research, development and innovation.  As a result, retail sales were and are below what they would have been and innovation, research, and development were limited.  Consequently, the economy was harmed.

200.    Moreover, as evidenced by the impact on merchant acceptance of the mandated Interchange Fee reductions in Australia, inflated Interchange Fees also artificially reduce merchant acceptance of Payment Cards.  These reductions in retail sales and merchant acceptance, coupled with the limitations on competition from other Networks resulting from Defendants' anticompetitive conduct, significantly reduced output below what it would have been.  By imposing a massive and hidden tax on both merchants and consumers, Defendants' conduct has decreased consumer welfare and imposed substantial anticompetitive harm.

201.    Further, because of the conduct detailed in this Amended Complaint, rue21 could not  limit these higher retail prices to customers using the Payment Cards that generate the underlying Interchange Fees.  All customers, including less affluent ones who are more likely to pay with cash, have had to bear the cost of these inflated Interchange Fees in the form of higher retail prices.

202.    Further, the imposition of supracompetitive Interchange Fees distorted Issuer incentives in both markets, perpetuating the fraud-prone magnetic stripe system in the United States.  This diminution of innovation is further harm to competition.

## COUNT I

### Against Visa for Horizontal Price Fixing and
### Horizontal Agreements Not to Compete in the Market for
### Credit Card Network Services

203.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 202 with the same force and effect as if set forth here in full.

204.    The agreement between Visa and its Member Banks not to compete and price fixing schemes constituted and continue to constitute anticompetitive horizontal restraints.

205.    Visa and its Member Banks have maintained the conspiracy for Visa Credit Card transactions throughout the Damages Period.

206.    This conspiracy has anticompetitively increased and maintained the Interchange Fees that merchants pay to Issuers for Visa Credit Card transactions, and imposes additional damages in the form of network fees, fines, and fraud losses.  These price increases were and are the products of the agreement among Visa and its owner/Member Banks that the banks will not compete for merchants' acceptance of Visa transactions.

207.    The price fixing conspiracy and agreement not to compete are *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.  This scheme serves no legitimate business purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

208.    rue21 has and will continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

209.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT II

### Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Debit Card Network Services

210.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 209 with the same force and effect as if set forth here in full.

211.    The agreement between Visa and its Member Banks not to compete and price fixing schemes constituted and continue to constitute anticompetitive horizontal restraints.

212.    Visa and its Member Banks maintained the conspiracy for Visa Debit Card transactions throughout the Damages Period.

213.    This conspiracy has anticompetitively increased and maintained the Interchange Fees that merchants pay to Issuers for Visa Debit Card transactions, and imposes additional damages in the form of network fees, fines, and fraud losses.  These price increases were and are the products of the agreement among Visa and its owner/Member Banks that the banks will not compete for merchants' acceptance of Visa transactions.

214.    The price fixing conspiracy and agreement not to compete are *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete are  unreasonable restraints of trade in violation of Section 1.  This scheme serves no legitimate business purpose and achieves no legitimate

efficiency benefit to offset its substantial anticompetitive effects.

215.   rue21 has and will continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

216.   As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT III

### Against MasterCard for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Credit Card Network Services

217.   rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 216 with the same force and effect as if set forth here in full.

218.   The agreement between MasterCard and its Member Banks not to compete and price fixing schemes constituted and continues to constitute anticompetitive horizontal restraints.

219.   MasterCard and its Member Banks have maintained the conspiracy for MasterCard Credit Card transactions throughout the Damages Period.

220.   This conspiracy has anticompetitively increased and maintained the Interchange Fees that merchants pay to Issuers on MasterCard Credit Card transactions, and imposes additional damages in the form of network fees, fines, and fraud losses.  These price increases were and are the products of the agreement among MasterCard and its owner/Member Banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

221.    The price fixing conspiracy and agreement not to compete are *per se* violations of Section 1 of the Sherman Act, as amended.   Even if analyzed under a rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.   This scheme serves no legitimate business purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

222.    rue21 has and will continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

223.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT IV

### Against MasterCard for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Debit Card Network Services

224.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 223 with the same force and effect as if set forth here in full.

225.    The agreement between MasterCard and its Member Banks not to compete and price fixing schemes constitute anticompetitive horizontal restraints.

226.    MasterCard and its Member Banks maintained the conspiracy for MasterCard Debit Card transactions throughout the Damages Period.

227.    This conspiracy has anticompetitively increased and maintained the Interchange Fees that merchants pay to Issuers for MasterCard Debit Card transactions, and imposed

additional damages in the form of network fees, fines, and fraud losses.  These price increases were and are the products of the agreement among MasterCard and its owner/Member Banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

228.    The price fixing conspiracy and agreement not to compete are *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.  This scheme serves no legitimate business purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

229.    rue21 has and will continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

230.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT V

### Against Visa for Vertical Price Restraints in the
### Market for Credit Card Network Services

231.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 230 with the same force and effect as if set forth here in full.

232.    Visa's and its Member Banks' price fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

233.    Visa entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, Visa acts as the enforcement agent for its rules and regulations and holds Issuers and Acquirers in its Network responsible for compliance with these rules and regulations.  These agreements have continued throughout the Damages Period.

234.    These vertical price restraints have and will continue to impose supracompetitive Interchange Fees on merchants for Visa Credit Card transactions, and have imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints, which have occurred throughout the Damages Period and are continuing in nature, constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme serves no legitimate business purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

235.    rue21 has and will continue to suffer antitrust injury from these unreasonable restraints of trade.

236.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

**COUNT VI**

**Against Visa for Vertical Price Restraints in the
Market for Debit Card Network Services**

237.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1
through 236 with the same force and effect as if set forth here in full.

238.    Visa's and its Member Banks' price fixing schemes and anti-steering rules
constitute unreasonable and anticompetitive vertical restraints.

239.    Visa entered into an express vertical agreement with each of its owner/Member
Banks, binding all of them to comply with the rules and regulations adopted by Visa, including
the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, Visa acts the
enforcement agent for its rules and regulations and holds Issuers and Acquirers in its Network
responsible for compliance with these rules and regulations.  These agreements have continued
throughout the damages period.

240.    These vertical price restraints have and will continue to impose supracompetitive
Interchange Fees on merchants for Visa Debit Card transactions, and have imposed additional
damages in the form of network fees, fines, and fraud losses.  These restraints, which occurred
throughout the Damages Period and are continuing in nature, constitute unreasonable restraints
of trade in violation of Section 1 of the Sherman Act.  This scheme serves no legitimate business
purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive
effects.

241.    These restraints continued in full effect throughout the Damages Period and
constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This

scheme served no legitimate business purpose, and it achieved no legitimate efficient benefit too offset its substantial anticompetitive effects.

242.    rue21 has and will continue to suffer antitrust injury from these unreasonable restraints of trade.

243.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT VII

### Against MasterCard for Vertical Price Restraints in
### the Market for Credit Card Network Services

244.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 243 with the same force and effect as if set forth here in full.

245.    MasterCard's and its Member Banks' price fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

246.    MasterCard entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, MasterCard acts as the enforcement agent for its rules and regulations and holds issuers and Acquirers in its Network responsible for compliance with these rules and regulations.  These agreements have continued throughout the Damages Period.

247.    These vertical price restraints have and will continue to impose supracompetitive Interchange Fees on merchants for MasterCard Credit Card transactions, and have imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints, which occurred throughout the Damages Period and  are continuing in nature, constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme serves no legitimate business purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

248.    These restraints continued in full effect throughout the Damages Period and constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme serves no legitimate business purpose, and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

249.    rue21 has and will continue to suffer antitrust injury from these unreasonable restraints of trade.

250.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT VIII

### Against MasterCard for Vertical Price Restraints in
### the Market for Debit Card Network Services

251.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 250 with the same force and effect as if set forth here in full.

252. MasterCard's and its Member Banks' price fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

253. MasterCard entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee, Honor All Issuers, and anti-steering rules. In turn, MasterCard acts as the enforcement agent for its rules and regulations and holds Issuers and Acquirers in its Network responsible for compliance with these rules and regulations. These agreements have continued throughout the Damages Period.

254. These vertical price restraints have and will continue to impose supracompetitive Interchange Fees on merchants for MasterCard Debit Card transactions and have imposed additional damages in the form of network fees, fines, and fraud losses. These restraints, which occurred throughout the Damages Period and are continuing in nature, constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme serves no legitimate business purpose and achieves no legitimate efficiency benefit to offset its substantial anticompetitive effects.

255. rue21 has and will continue to suffer antitrust injury from these unreasonable restraints of trade.

256. As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, rue21 has been injured in its business and property in an amount not presently known with precision.

## COUNT IX

### Against Visa for Monopolization of the Market for
### Debit Card Network Services

257.     Rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 256 with the same force and effect as if set forth here in full.

258.     Though the anticompetitive conduct set forth above, Visa has unlawfully acquired monopoly power in the market for Debit Card Network Services.  Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the market for Debit Card Network Services.

259.     Through the FANF and its exploitation of the industry migration to EMV technology, Visa has further unlawfully maintained its monopoly through anticompetitive conduct that had the purpose and effect of excluding competition from, and raising the cost of, other providers of Debit Card Network Services.

260.     As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for Debit Card and Credit Card Network Services were and are set at supracompetitive levels and rue21 suffered and continues to suffer injury to its business and property by paying such artificially-inflated fees, along with incurring chargebacks and unnecessary hardware implementation costs.  rue21 has suffered and continues to suffer antitrust injury as a result of these acts.

261.     Visa's unlawful acquisition of monopoly power constitutes a violation of Section 2 of the Sherman Act.   Visa's unlawful maintenance of its monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

## COUNT X

### Against Visa for Attempted Monopolization of the Market for
### Debit Card Network Services

262.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 261, with the same force and effect as if set forth here in full.

263.    Visa has purposely taken acts that have the effect of giving Visa power over price and the ability to exclude competition in the market for Debit Card Network Services.

264.    Visa specifically intended to monopolize the market for Debit Card Network Services, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for Debit Card Network Services, by its specific intent to exclude competition in the market for Debit Card Network Services, and by its specific intent to take acts with the effects of giving Visa power over price and restraining competition.

265.    To the extent Visa does not already possess monopoly power in the market for Debit Card Network Services, there is a dangerous probability that it will obtain monopoly power through the FANF and through its exploitation of the industry migration to EMV technology to suppress competition in this market.

266.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for Debit Card Network Services were set at artificially high, supracompetitive levels and rue21 has suffered and continues to suffer injury to its business and property by paying such supracompetitive Interchange Fees, along with incurring chargebacks and unnecessary hardware implementation costs.  Plaintiffs suffered antitrust injury from these attempted acts of monopolization.

## COUNT XI

### Against All Defendants for Violation of State
### Antitrust and Unfair Competition Laws

267.    rue21 repeats and re-alleges each and every allegation contained in paragraphs 1 through 266 with the same force and effect as if set forth here in full.

268.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

269.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

270.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

271.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of District of Columbia Code § 28-4501 et seq.

272.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Florida Stat. Ann. § 542.15 et seq. and Florida Stat. Ann. § 501.201 et

seq.

273.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Idaho Code § 48-101 et seq.

274.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

275.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Indiana Code 24-1-2 et seq.

276.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

277.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et seq.

278.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Kentucky Stat. Ann. §365.020 et seq. and § 367.175 et seq.

279.     By reason of the foregoing, Defendants and their Member Banks entered into

agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Louisiana Revised Statutes § 51:121, et seq.

280. By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Maine Rev. Stat. Ann. 10, § 1101 et seq.

281. By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Maryland Commercial Law Code Ann. § 11-201 et seq.

282. By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of the Massachusetts Antitrust Act, 93 Mass. Gen. Laws § 1 et seq.

283. By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

284. By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

285. By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 et seq.

286.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of the Missouri Antitrust Law, § 416.011 et seq.

287.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged  and continue to engage in anticompetitive practices in violation of the Montana Rev. Code Ann. §30-14-201 et seq.

288.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

289.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

290.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of New Hampshire Rev. Stat. Ann. §356.1 et seq.

291.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

292.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

293.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

294.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 et seq.

295.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Ohio Rev. Code. § 1331.01 et seq.

296.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of 79 Oklahoma Stat. § 201 et seq.

297.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

298.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

299.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1 et seq.

300.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

301.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Texas Bus. & Com. Code Ann. § 15.01 et seq.

302.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Utah Code Ann. §76-10-911 et seq.

303.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

304.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of the Virginia Antitrust Act, Va. Code §59.1-9.1 et seq.

305.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of the Washington Rev. Code 19.86.010 et seq.

306.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of West Virginia Antitrust Act, 47-18-1 et seq.

307.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Wisconsin Stat. Ann. § 133.01 et seq.

308.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged and continue to engage in anticompetitive practices in violation of Wyoming Stat. §40-4-101 et seq.

309.    As a direct and proximate result of Defendants' unlawful conduct, rue21 has and will continue to suffer injury to its business and property in each of these states by paying artificially-inflated, supracompetitive Interchange Fees for Credit Card Network Services and Debit Card Network Services.

## PRAYER FOR RELIEF

Wherefore, rue21, inc. prays for relief and judgment as follows:

A.    Judgment in its favor and against each Defendant in an amount to be determined at trial including, but not limited to, compensatory damages for past and future injury, trebled damages in accordance with antitrust law, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of suit, as permitted by law;

B.    A declaration by this Honorable Court that the setting of the default interchange rate, Honor All Cards Rules, No Discount Rules,  No Surcharge Rules, Anti-Discrimination Rules, No Competing Marks Rules, No Bypass Rules, All Outlets Rules and other contractual restraints are anticompetitive and violate Sections 1 and 2 of the Sherman Act;

C.      Permanent injunctive and equitable relief sufficient to eliminate the anticompetitive effects of the Defendants' actions, including but not limited to:

1.      Enjoining Defendants from further enforcing any and all rules, policies, contractual provisions, and any other activities or actions by Defendants that reduce, impede, eliminate or prevent competition among issuers for merchant acceptance or facilitate the collective setting of merchant fees and charges, including but not limited to the setting of default interchange fees, Honor All Cards Rules, No Discount Rules, No Surcharge Rules, Anti-Discrimination Rules, No Competing Marks Rules, No Bypass Rules, All Outlets Rules and any other contractual restraints.

2.      Enjoining Defendants from engaging in any future activities or actions, including but not limited to the adoption of any future rules, policies or contractual provisions, with the same or similar anticompetitive effects.

3.      Enjoining Defendants from imposing any new fee or charge as a substitute for any fee or charge enjoined by this Honorable Court or for the purpose of evading the remedies necessitated by the anticompetitive effects of their past and current rules, policies, contractual provisions and other activities;

4.      Requiring Defendants to take affirmative action to facilitate competition for merchant acceptance, including but not limited to competition in the negotiation of merchant fees and charges and in in any other areas in which Defendants' rules have prevented competition;

5.      Requiring Defendants to comply with federal law and provide rue21 with routing options on all debit transactions;

6.      Prohibiting Defendants from taking any actions that impede rue21's access to clear and timely information, including at the point of sale, concerning the amount of fees and charges and the rules that will apply to each transaction, or impede rue21's communication of the amount of such fees and charges and the rules that will apply to each transaction to customers at the time of the transaction;

7.      Prohibiting Defendants from communicating to any issuer the terms of any agreement between any other issuer and any merchant or facilitating the exchange of such information among issuers;

8.      Prohibiting Defendants from coordinating with each other with respect to any of the remedies related to their past anticompetitive conduct; and

9.      Exercising continuing jurisdiction over such injunctive relief and equitable relief, including, but not limited to, appointing a special master to oversee prompt compliance by Defendants with all terms of the Court's judgment.

D.      Such other and further relief as this Honorable Court may deem just, equitable and proper and/or as otherwise permitted by law.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues properly triable thereby.


**MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, PLLC**

By: */s/ Edward G. Brandenstein*
Edward G. Brandenstein
PA I.D. #73672
*ebrandenstein@mdbbe.com*
Pro hac vice admitted

Paul R. Robinson
PA I.D. #65581
*probinson@mdbbe.com*
Pro hac vice admitted

600 Grant Street, Suite 4850
Pittsburgh, PA  15219
Telephone: (412) 261-6600
Fax: (412) 471-2754

*Counsel for Plaintiff rue21, inc.*